# WATKINS *v.* UNITED STATES.

No. 261.   Argued March 7, 1957.—Decided June 17, 1957.

180

*Joseph L. Rauh, Jr.* argued the cause for petitioner. With him on the brief were *Harold A. Cranefield, Norma Zarky, John Silard, Daniel H. Pollitt* and *Sidney S. Sachs.*

*Solicitor General Rankin* argued the cause for the United States. With him on the brief were *Assistant Attorney General Tompkins, Philip R. Monahan* and *Doris H. Spangenburg.*

*Osmond K. Fraenkel* filed a brief for the American Civil Liberties Union, as *amicus curiae,* supporting petitioner, and *Telford Taylor* filed a brief for Metcalf, as *amicus curiae,* urging reversal.

*Herbert R. O'Conor* filed a brief for the American Bar Association, as *amicus curiae,* urging affirmance. With him on the brief were *Julius Applebaum, Tracy E. Griffin, John M. Palmer, Paul W. Updegraff* and *Louis C. Wyman.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This is a review by certiorari of a conviction under 2 U. S. C. § 192 for "contempt of Congress." The misdemeanor is alleged to have been committed during a

hearing before a congressional investigating committee. It is not the case of a truculent or contumacious witness who refuses to answer all questions or who, by boisterous or discourteous conduct, disturbs the decorum of the committee room. Petitioner was prosecuted for refusing to make certain disclosures which he asserted to be beyond the authority of the committee to demand. The controversy thus rests upon fundamental principles of the power of the Congress and the limitations upon that power. We approach the questions presented with conscious awareness of the far-reaching ramifications that can follow from a decision of this nature.

On April 29, 1954, petitioner appeared as a witness in compliance with a subpoena issued by a Subcommittee of the Committee on Un-American Activities of the House of Representatives. The Subcommittee elicited from petitioner a description of his background in labor union activities. He had been an employee of the International Harvester Company between 1935 and 1953. During the last eleven of those years, he had been on leave of absence to serve as an official of the Farm Equipment Workers International Union, later merged into the United Electrical, Radio and Machine Workers. He rose to the position of President of District No. 2 of the Farm Equipment Workers, a district defined geographically to include generally Canton and Rock Falls, Illinois, and Dubuque, Iowa. In 1953, petitioner joined the United Automobile Workers International Union as a labor organizer.

Petitioner's name had been mentioned by two witnesses who testified before the Committee at prior hearings. In September 1952, one Donald O. Spencer admitted having been a Communist from 1943 to 1946. He declared that he had been recruited into the Party with the endorsement and prior approval of petitioner, whom he identified as the then District Vice-President of the Farm Equip-

ment Workers.[1]   Spencer also mentioned that petitioner had attended meetings at which only card-carrying Communists were admitted.   A month before petitioner testified, one Walter Rumsey stated that he had been recruited into the Party by petitioner.[2]   Rumsey added that he had paid Party dues to, and later collected dues from, petitioner, who had assumed the name, Sam Brown.   Rumsey told the Committee that he left the Party in 1944.

Petitioner answered these allegations freely and without reservation.   His attitude toward the inquiry is clearly revealed from the statement he made when the questioning turned to the subject of his past conduct, associations and predilections:

"I am not now nor have I ever been a card-carrying member of the Communist Party.   Rumsey was wrong when he said I had recruited him into the party, that I had received his dues, that I paid dues to him, and that I had used the alias Sam Brown.

"Spencer was wrong when he termed any meetings which I attended as closed Communist Party meetings.

"I would like to make it clear that for a period of time from approximately 1942 to 1947 I cooperated with the Communist Party and participated in Communist activities to such a degree that some persons may honestly believe that I was a member of the party.

"I have made contributions upon occasions to Communist causes.   I have signed petitions for Commu-

[1] R. 153–163; Hearings before the House of Representatives Committee on Un-American Activities on Communist Activities in the Chicago Area—Part 1, 82d Cong., 2d Sess. 3737–3752.

[2] R. 135–149; Hearings before the House of Representatives Committee on Un-American Activities on Investigation of Communist Activities in the Chicago Area—Part 2, 83d Cong., 2d Sess. 4243–4260.

nist causes. I attended caucuses at an FE convention at which Communist Party officials were present.

"Since I freely cooperated with the Communist Party I have no motive for making the distinction between cooperation and membership except the simple fact that it is the truth. I never carried a Communist Party card. I never accepted discipline and indeed on several occasions I opposed their position.

"In a special convention held in the summer of 1947 I led the fight for compliance with the Taft-Hartley Act by the FE–CIO International Union. This fight became so bitter that it ended any possibility of future cooperation." [3]

The character of petitioner's testimony on these matters can perhaps best be summarized by the Government's own appraisal in its brief:

"A more complete and candid statement of his past political associations and activities (treating the Communist Party for present purposes as a mere political party) can hardly be imagined. Petitioner certainly was not attempting to conceal or withhold from the Committee his own past political associations, predilections, and preferences. Furthermore, petitioner told the Committee that he was entirely willing to identify for the Committee, and answer any questions it might have concerning, 'those persons whom I knew to be members of the Communist Party,' provided that, 'to [his] best knowledge and belief,' they still were members of the Party . . . ." [4]

The Subcommittee, too, was apparently satisfied with petitioner's disclosures. After some further discussion elaborating on the statement, counsel for the Committee

---

[3] R. 75; Hearings, *supra*, note 2, Part 3, at 4268.

[4] Brief for Respondent, pp. 59–60.

turned to another aspect of Rumsey's testimony. Rumsey had identified a group of persons whom he had known as members of the Communist Party, and counsel began to read this list of names to petitioner. Petitioner stated that he did not know several of the persons. Of those whom he did know, he refused to tell whether he knew them to have been members of the Communist Party. He explained to the Subcommittee why he took such a position:

> "I am not going to plead the fifth amendment, but I refuse to answer certain questions that I believe are outside the proper scope of your committee's activities. I will answer any questions which this committee puts to me about myself. I will also answer questions about those persons whom I knew to be members of the Communist Party and whom I believe still are. I will not, however, answer any questions with respect to others with whom I associated in the past. I do not believe that any law in this country requires me to testify about persons who may in the past have been Communist Party members or otherwise engaged in Communist Party activity but who to my best knowledge and belief have long since removed themselves from the Communist movement.
>
> "I do not believe that such questions are relevant to the work of this committee nor do I believe that this committee has the right to undertake the public exposure of persons because of their past activities. I may be wrong, and the committee may have this power, but until and unless a court of law so holds and directs me to answer, I most firmly refuse to discuss the political activities of my past associates." [5]

---

[5] R. 85–86; Hearings, *supra*, note 2, Part 3, at 4275.

The Chairman of the Committee submitted a report of petitioner's refusal to answer questions to the House of Representatives. H. R. Rep. No. 1579, 83d Cong., 2d Sess. The House directed the Speaker to certify the Committee's report to the United States Attorney for initiation of criminal prosecution. H. Res. 534, 83d Cong., 2d Sess.[6] A seven-count indictment was returned.[7] Petitioner waived his right to jury trial and was found guilty on all counts by the court. The sentence, a fine of $100 and one year in prison, was suspended, and petitioner was placed on probation.

An appeal was taken to the Court of Appeals for the District of Columbia. The conviction was reversed by a three-judge panel, one member dissenting. Upon rehearing *en banc*, the full bench affirmed the conviction with the judges of the original majority in dissent. 98 U. S. App. D. C. 190, 233 F. 2d 681. We granted certio-

---

[6] There were nine citations of contempt voted at the same time. Petitioner's case was the second to be acted upon. There was no debate other than a statement by Representative Javits on a proposal to consolidate the legislative bodies investigating subversion. 100 Cong. Rec. 6382–6386. The resolution to prosecute petitioner passed by a voice vote.

There was lengthier discussion and a recorded vote on the first case considered by the House. *Id.*, at 6375–6382. In none of the cases was there any debate on the merits of the witnesses' conduct. *Id.*, at 6375–6401.

[7] The counts of the indictment were patterned from the sequence of the questioning by the Committee. Petitioner was asked separately about six persons, and these are the basis of the first six counts. The last count comprises the omnibus question that gave a list of twenty-five names for petitioner to identify. With two exceptions, the questions asked for knowledge of past membership in the Communist Party. The context of the interrogation indicates that the Committee's concern was with such past conduct. Petitioner agreed to and did disclose his knowledge of those he believed to be present members.

rari because of the very important questions of constitutional law presented. 352 U. S. 822.

We start with several basic premises on which there is general agreement. The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste. But, broad as is this power of inquiry, it is not unlimited. There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress. This was freely conceded by the Solicitor General in his argument of this case.[8] Nor is the Congress a law enforcement or trial agency. These are functions of the executive and judicial departments of government. No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress. Investigations conducted solely for the personal aggrandizement of the investigators or to "punish" those investigated are indefensible.

It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify

---

[8] "Now, we don't claim on behalf of the Government that there is any right to expose for the purposes of exposure. And I don't know that Congress has ever claimed any such right. But we do say, in the same breath, that there is a right to inform the public at the same time you inform the Congress."

fully with respect to matters within the province of proper investigation.  This, of course, assumes that the constitutional rights of witnesses will be respected by the Congress as they are in a court of justice.  The Bill of Rights is applicable to investigations as to all forms of governmental action.  Witnesses cannot be compelled to give evidence against themselves.  They cannot be subjected to unreasonable search and seizure.  Nor can the First Amendment freedoms of speech, press, religion, or political belief and association be abridged.

The rudiments of the power to punish for "contempt of Congress" come to us from the pages of English history. The origin of privileges and contempts extends back into the period of the emergence of Parliament.  The establishment of a legislative body which could challenge the absolute power of the monarch is a long and bitter story. In that struggle, Parliament made broad and varied use of the contempt power.  Almost from the beginning, both the House of Commons and the House of Lords claimed absolute and plenary authority over their privileges.  This was an independent body of law, described by Coke as *lex parliamenti.*[9]  Only Parliament could declare what those privileges were or what new privileges were occasioned, and only Parliament could judge what conduct constituted a breach of privilege.

In particular, this exclusion of *lex parliamenti* from the *lex terrae,* or law of the land, precluded judicial review of the exercise of the contempt power or the assertion of privilege.  Parliament declared that no court had jurisdiction to consider such questions.  In the latter part of the seventeenth century, an action for false imprisonment was brought by one Jay who had been held in contempt.  The defendant, the Serjeant-at-Arms of the House of Commons, demurred that he had taken the plaintiff

---

[9] Coke, Fourth Institute, 15.

into custody for breach of privilege. The Chief Justice, Pemberton, overruled the demurrer. Summoned to the bar of the House, the Chief Justice explained that he believed that the assertion of privilege went to the merits of the action and did not preclude jurisdiction. For his audacity, the Chief Justice was dispatched to Newgate Prison.[10]

It seems inevitable that the power claimed by Parliament would have been abused. Unquestionably it was. A few examples illustrate the way in which individual rights were infringed. During the seventeenth century, there was a violent upheaval, both religious and political. This was the time of the Reformation and the establishment of the Church of England. It was also the period when the Stuarts proclaimed that the royal prerogative was absolute. Ultimately there were two revolutions, one protracted and bloody, the second without bloodshed. Critical commentary of all kinds was treated as contempt of Parliament in these troubled days. Even clergymen were imprisoned for remarks made in their sermons.[11] Perhaps the outstanding case arose from the private conversation of one Floyd, a Catholic, in which he expressed pleasure over the misfortune of the King's Protestant son-in-law and his wife. Floyd was not a member of Parliament. None of the persons concerned was in any way connected with the House of Commons. Nevertheless, that body imposed an humiliating and cruel sentence upon Floyd for contempt.[12] The House of Lords inter-

---

[10] H. Comm. J. (1688–1693) 227; *Jay* v. *Topham,* 12 How. St. Tr. 822.

[11] *Proceedings against Richard Thompson,* 8 How. St. Tr. 2; Wittke, The History of English Parliamentary Privilege, 50.

[12] "Floyd, for uttering a few contemptible expressions, was degraded from his gentility, and to be held an infamous person; his testimony not to be received; to ride from the Fleet to Cheapside on horseback, without a saddle, with his face to the horse's tail, and the tail in

vened, rebuking the Commons for their extension of the privilege. The Commons acceded and transferred the record of the case to the Lords, who imposed substantially the same penalty.[13]

Later in that century, during the reign of Charles II, there was great unrest over the fact that the heir apparent, James, had embraced Catholicism. Anti-Catholic feeling ran high, spilling over a few years later when the infamous rogue, Titus Oates, inflamed the country with rumors of a "Popish Plot" to murder the King. A committee of Parliament was appointed to learn the sources of certain pamphlets that had been appearing. One was entitled: The Grand Question Concerning the Prorogation of this Parliament for a Year and Three Months Stated and Discussed. A Doctor Carey admitted to the committee that he knew the author, but refused to divulge his name. Brought to the bar of the House of Lords, he persisted in this stand. The House imposed a fine of £1,000 and committed the witness to the Tower.[14]

A hundred years later, George III had managed to gain control of Parliament through his ministers. The King could not silence the opposition, however, and one of the most vocal was John Wilkes. This precipitated a

---

his hand, and then to stand two hours in the pillory, and to be branded in the forehead with the letter K; to ride four days afterwards in the same manner to Westminster, and then to stand two hours more in the pillory, with words on a paper in his hat showing his offence; to be whipped at the cart's tail from the Fleet to Westminster Hall; to pay a fine of 5000*l*.; and to be a prisoner in Newgate during his life." 1 De Lolme, The Rise and Progress of the English Constitution, 348.

[13] H. L. J. (1620–1628) 110–111, 113, 116, 124, 125, 127, 132, 133–134, 183; Wittke, 76–77. See also Kelke, Constitutional Law and Cases, 155–156.

[14] H. L. J. (1675–1681) 54–55.

struggle that lasted for several years until Wilkes finally prevailed. One writer sums up the case thus:

"He had won a victory for freedom of the press. He had directed popular attention to the royally-controlled House of Commons, and pointed out its unrepresentative character, and had shown how easily a claim of privilege might be used to sanction the arbitrary proceedings of ministers and Parliament, even when a fundamental right of the subject was concerned. It was one of life's little ironies that work of such magnitude had been reserved for one of the worst libertines and demagogues of all time." [15]

Even as late as 1835, the House of Commons appointed a select committee to inquire into ". . . the origin, nature, extent and tendency of the Orange Institutions." This was a political-religious organization, vehemently Protestant in religion and strongly in favor of the growth of the British Empire. The committee summoned the Deputy Grand Secretary and demanded that he produce all the records of the organization. The witness refused to turn over a letter-book, which he admitted contained his answers to many communications upon Orange business. But it also contained, he said, records of private communications with respect to Orangeism. Summoned to the bar of the House of Commons, he remained adamant and was committed to Newgate Prison.[16]

Modern times have seen a remarkable restraint in the use by Parliament of its contempt power. Important investigations, like those conducted in America by congressional committees, are made by Royal Commissions

---

[15] Wittke, 122–123. With all his knavery, Wilkes was long a hero with certain persecuted groups in England. Here, streets and other public places have been named for him and his writings.

[16] H. Comm. J. (1835) 533, 564–565, 571, 575.

of Inquiry.[17]   These commissions are comprised of experts in the problem to be studied.   They are removed from the turbulent forces of politics and partisan considerations.   Seldom, if ever, have these commissions been given the authority to compel the testimony of witnesses or the production of documents.[18]   Their success in fulfilling their fact-finding missions without resort to coercive tactics is a tribute to the fairness of the processes to the witnesses and their close adherence to the subject matter committed to them.

The history of contempt of the legislature in this country is notably different from that of England.   In the early days of the United States, there lingered the direct knowledge of the evil effects of absolute power.   Most of the instances of use of compulsory process by the first Congresses concerned matters affecting the qualification or integrity of their members or came about in inquiries dealing with suspected corruption or mismanagement of government officials.[19]   Unlike the English practice, from the very outset the use of contempt power by the legislature was deemed subject to judicial review.[20]

There was very little use of the power of compulsory process in early years to enable the Congress to obtain facts pertinent to the enactment of new statutes or the

---

[17] Finer, Congressional Investigations: The British System, 18 U. of Chi. L. Rev. 521, 554–561; Smelser, Legislative Investigations: Safeguards for Witnesses: The Problem in Historical Perspective, 29 Notre Dame Law. 163, 167; Clokie & Robinson, Royal Commissions of Inquiry.

[18] Finer, 559; Smelser, 167; Clokie & Robinson, 186–187.

[19] See Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv. L. Rev. 153, 168–191; Potts, Power of Legislative Bodies to Punish for Contempt, 74 U. of Pa. L. Rev. 691, 719–725.

[20] The first case to reach this Court was *Anderson* v. *Dunn,* 6 Wheat. 204, which upheld the power of the House of Representatives to reprimand a person for attempting to bribe a member of the House.

administration of existing laws. The first occasion for such an investigation arose in 1827 when the House of Representatives was considering a revision of the tariff laws.[21]  In the Senate, there was no use of a fact-finding investigation in aid of legislation until 1859.[22]  In the Legislative Reorganization Act, the Committee on Un-American Activities was the only standing committee of the House of Representatives that was given the power to compel disclosures.[23]

It is not surprising, from the fact that the Houses of Congress so sparingly employed the power to conduct investigations, that there have been few cases requiring judicial review of the power.  The Nation was almost one hundred years old before the first case reached this Court to challenge the use of compulsory process as a legislative device, rather than in inquiries concerning the elections

---

[21] On December 31, 1827, the House Committee on Manufacturers was given the task of inquiring into the effect that the proposed upward revision in the tariff schedules would have upon domestic manufacturers.  The power of the House to authorize a fact-finding inquiry in aid of legislation was seriously challenged.  After full debate the investigation was authorized by a vote of 102 to 88. 4 Cong. Deb. 889.

[22] The subject matter of the select committee was ". . . the late invasion and seizure of the armory and arsenal of the United States at Harper's Ferry, in Virginia, by a band of armed men . . . . And that said committee [shall] report whether any and what legislation may, in their opinion, be necessary, on the part of the United States, for the future preservation of the peace of the country, or for the safety of the public property; and that said committee [shall] have power to send for persons and papers."  Cong. Globe, 36th Cong., 1st Sess. 141 (1859).

[23] 60 Stat. 828–829.  All standing committees in the Senate were invested with the power of compulsory process.  60 Stat. 830–831. During the 83d Congress, two other standing committees in the House of Representatives, the Appropriations and Government Operations Committees, possessed that power.  99 Cong. Rec. 16–19.

or privileges of Congressmen.[24]   In *Kilbourn* v. *Thompson*, 103 U. S. 168, decided in 1881, an investigation had been authorized by the House of Representatives to learn the circumstances surrounding the bankruptcy of Jay Cooke & Company, in which the United States had deposited funds.   The committee became particularly interested in a private real estate pool that was a part of the financial structure.   The Court found that the subject matter of the inquiry was "in its nature clearly judicial and therefore one in respect to which no valid legislation could be enacted."   The House had thereby exceeded the limits of its own authority.

Subsequent to the decision in *Kilbourn,* until recent times, there were very few cases dealing with the investigative power.[25]   The matter came to the fore again when the Senate undertook to study the corruption in the handling of oil leases in the 1920's.   In *McGrain* v. *Daugherty,* 273 U. S. 135, and *Sinclair* v. *United States,* 279 U. S. 263, the Court applied the precepts of *Kilbourn* to uphold the authority of the Congress to conduct the challenged investigations.   The Court recognized the danger to effective and honest conduct of the Government

---

[24] The first court that was called upon to review the constitutional validity of a legislative inquiry was the New York Court of Common Pleas.   The case arose out of the inquiry by the Common Council of New York into the conduct of the Police Department in 1855. Judge Charles Patrick Daly upheld the investigative power as implicit in the functions of a legislature, but ruled that the examination of witnesses must be confined to the subject under investigation. Applying this standard, he ruled that questions directed to the national origin of policemen were improper under the investigators' authorizing resolution.   *Briggs* v. *Mackeller,* 2 Abbott's Practice Reports 30 (N. Y. Common Pleas 1855).

[25] *In re Chapman,* 166 U. S. 661 (upheld conviction under R. S. § 102, forerunner of 2 U. S. C. § 192, for refusal to answer questions in inquiry into charges of corruption among certain Senators with respect to pending bill on sugar tariff) ; cf. *Marshall* v. *Gordon,* 243 U. S. 521.

if the legislature's power to probe corruption in the executive branch were unduly hampered.

Following these important decisions, there was another lull in judicial review of investigations. The absence of challenge, however, was not indicative of the absence of inquiries. To the contrary, there was vigorous use of the investigative process by a Congress bent upon harnessing and directing the vast economic and social forces of the times. Only one case came before this Court, and the authority of the Congress was affirmed.[26]

In the decade following World War II, there appeared a new kind of congressional inquiry unknown in prior periods of American history. Principally this was the result of the various investigations into the threat of subversion of the United States Government, but other subjects of congressional interest also contributed to the changed scene. This new phase of legislative inquiry involved a broad-scale intrusion into the lives and affairs of private citizens. It brought before the courts novel questions of the appropriate limits of congressional inquiry. Prior cases, like *Kilbourn, McGrain* and *Sinclair,* had defined the scope of investigative power in terms of the inherent limitations of the sources of that power. In the more recent cases, the emphasis shifted to problems of accommodating the interest of the Government with the rights and privileges of individuals. The central theme was the application of the Bill of Rights as a restraint upon the assertion of governmental power in this form.

It was during this period that the Fifth Amendment privilege against self-incrimination was frequently in-

---

[26] *Jurney* v. *MacCracken,* 294 U. S. 125 (upheld power of Senate to punish as a contempt the action of a witness in allowing the destruction and removal of papers subject to the subpoena of a Senate committee; held that enactment of 2 U. S. C. § 192 did not impair contempt power of Houses of Congress).

voked and recognized as a legal limit upon the authority of a committee to require that a witness answer its questions.[27] Some early doubts as to the applicability of that privilege before a legislative committee never matured.[28] When the matter reached this Court, the Government did not challenge in any way that the Fifth Amendment protection was available to the witness, and such a challenge could not have prevailed. It confined its argument to the character of the answers sought and to the adequacy of the claim of privilege. *Quinn* v. *United States,* 349 U. S. 155; *Emspak* v. *United States,* 349 U. S. 190; *Bart* v. *United States,* 349 U. S. 219.[29]

A far more difficult task evolved from the claim by witnesses that the committees' interrogations were infringements upon the freedoms of the First Amendment.[30]

---

[27] The first reported case in which the claim of the privilege against self-incrimination was allowed in a congressional inquiry proceeding was *United States* v. *Yukio Abe,* 95 F. Supp. 991. Prior thereto, several state courts had held that legislative investigations were subject to the witness' privilege not to accuse himself under state constitutions. *Emery's Case,* 107 Mass. 172, decided in 1871 is the earliest. See also *Ex parte Johnson,* 187 S. C. 1, 196 S. E. 164.

[28] *E. g.,* Excerpts from Hearings before the House of Representatives Committee on Un-American Activities—Regarding Investigation of Communist Activities in Connection with the Atom Bomb, 80th Cong., 2d Sess. 5; N. Y. Herald Tribune, Sept. 6, 1948, p. 3, col. 6–7.

[29] Appropriateness of the privilege has been upheld without question in many cases arising out of congressional inquiry. See, *e. g., Starkovich* v. *United States,* 231 F. 2d 411; *Aiuppa* v. *United States,* 201 F. 2d 287; *United States* v. *Costello,* 198 F. 2d 200; *Marcello* v. *United States,* 196 F. 2d 437; *United States* v. *Di Carlo,* 102 F. Supp. 597; *United States* v. *Licavoli,* 102 F. Supp. 607; *United States* v. *Cohen,* 101 F. Supp. 906; *United States* v. *Jaffe,* 98 F. Supp. 191; *United States* v. *Fitzpatrick,* 96 F. Supp. 491; *United States* v. *Raley,* 96 F. Supp. 495; *United States* v. *Yukio Abe,* 95 F. Supp. 991.

[30] The first reported decision, made in 1947, grew out of the inquiry of the Un-American Activities Committee into certain organizations

Clearly, an investigation is subject to the command that the Congress shall make no law abridging freedom of speech or press or assembly. While it is true that there is no statute to be reviewed, and that an investigation is not a law, nevertheless an investigation is part of lawmaking. It is justified solely as an adjunct to the legislative process. The First Amendment may be invoked against infringement of the protected freedoms by law or by lawmaking.[31]

Abuses of the investigative process may imperceptibly lead to abridgment of protected freedoms. The mere summoning of a witness and compelling him to testify, against his will, about his beliefs, expressions or associations is a measure of governmental interference. And when those forced revelations concern matters that are unorthodox, unpopular, or even hateful to the general public, the reaction in the life of the witness may be disastrous. This effect is even more harsh when it is past beliefs, expressions or associations that are disclosed and judged by current standards rather than those contemporary with the matters exposed. Nor does the witness alone suffer the consequences. Those who are identified by witnesses and thereby placed in the same glare of publicity are equally subject to public stigma, scorn and obloquy. Beyond that, there is the more subtle and immeasurable effect upon those who tend to adhere to

suspected of subversive actions. Subpoenas *duces tecum* had been issued calling for the correspondence and other records of these organizations. Refusals to comply were followed by prosecutions under 2 U. S. C. § 192. The District Court denied motions to dismiss the indictments in *United States* v. *Bryan*, 72 F. Supp. 58. The decision with respect to the First Amendment was affirmed in *Barsky* v. *United States*, 167 F. 2d 241.

[31] See *United States* v. *Rumely*, 345 U. S. 41, 43–44; *Lawson* v. *United States*, 176 F. 2d 49, 51–52; *Barsky* v. *United States*, 167 F. 2d 241, 244–250; *United States* v. *Josephson*, 165 F. 2d 82, 90–92.

the most orthodox and uncontroversial views and associations in order to avoid a similar fate at some future time. That this impact is partly the result of non-governmental activity by private persons cannot relieve the investigators of their responsibility for initiating the reaction.

The Court recognized the restraints of the Bill of Rights upon congressional investigations in *United States* v. *Rumely,* 345 U. S. 41. The magnitude and complexity of the problem of applying the First Amendment to that case led the Court to construe narrowly the resolution describing the committee's authority. It was concluded that, when First Amendment rights are threatened, the delegation of power to the committee must be clearly revealed in its charter.

Accommodation of the congressional need for particular information with the individual and personal interest in privacy is an arduous and delicate task for any court. We do not underestimate the difficulties that would attend such an undertaking. It is manifest that despite the adverse effects which follow upon compelled disclosure of private matters, not all such inquiries are barred. *Kilbourn* v. *Thompson* teaches that such an investigation into individual affairs is invalid if unrelated to any legislative purpose. That is beyond the powers conferred upon the Congress in the Constitution. *United States* v. *Rumely* makes it plain that the mere semblance of legislative purpose would not justify an inquiry in the face of the Bill of Rights. The critical element is the existence of, and the weight to be ascribed to, the interest of the Congress in demanding disclosures from an unwilling witness. We cannot simply assume, however, that every congressional investigation is justified by a public need that overbalances any private rights affected. To do so would be to abdicate the responsibility placed by the Constitution upon the judiciary to insure that the Congress does not unjustifiably encroach upon an individual's

right to privacy nor abridge his liberty of speech, press, religion or assembly.

Petitioner has earnestly suggested that the difficult questions of protecting these rights from infringement by legislative inquiries can be surmounted in this case because there was no public purpose served in his interrogation. His conclusion is based upon the thesis that the Subcommittee was engaged in a program of exposure for the sake of exposure. The sole purpose of the inquiry, he contends, was to bring down upon himself and others the violence of public reaction because of their past beliefs, expressions and associations. In support of this argument, petitioner has marshalled an impressive array of evidence that some Congressmen have believed that such was their duty, or part of it.[32]

---

[32] In a report to the House, the Committee declared:

"While Congress does not have the power to deny to citizens the right to believe in, teach, or advocate, communism, fascism, and naziism, it does have the right to focus the spotlight of publicity upon their activities . . . ." H. R. Rep. No. 2, 76th Cong., 1st Sess. 13.

A year later, the Committee reported that ". . . investigation to inform the American people . . . is the real purpose of the House Committee." H. R. Rep. No. 1476, 76th Cong., 3d Sess. 1–2.

A pamphlet issued by the Committee in 1951 stated that: "Exposure in a systematic way began with the formation of the House Committee on Un-American Activities, May 26, 1938." The Committee believed itself commanded ". . . to expose people and organizations attempting to destroy this country. That is still its job and to that job it sticks." 100 Things You Should Know About Communism, H. R. Doc. No. 136, 82d Cong., 1st Sess. 19, 67.

In its annual reports, the Committee has devoted a large part of its information to a public listing of names along with a summary of their activities. ". . . [T]he committee feels that the Congress and the American people will have a much clearer and fuller picture of the success and scope of communism in the United States by having set forth the names and, where possible, the positions occupied by individuals who have been identified as Communists, or former Communists, during the past year." H. R. Rep. No. 2516, 82d Cong., 2d Sess. 6–7.

200

We have no doubt that there is no congressional power to expose for the sake of exposure. The public is, of course, entitled to be informed concerning the workings of its government.[33] That cannot be inflated into a general power to expose where the predominant result can only be an invasion of the private rights of individuals. But a solution to our problem is not to be found in testing the motives of committee members for this purpose. Such is not our function. Their motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served.[34]

Petitioner's contentions do point to a situation of particular significance from the standpoint of the constitutional limitations upon congressional investigations. The theory of a committee inquiry is that the committee members are serving as the representatives of the parent assembly in collecting information for a legislative purpose. Their function is to act as the eyes and ears of the Congress in obtaining facts upon which the full legislature can act. To carry out this mission, committees and subcommittees, sometimes one Congressman,

---

[33] We are not concerned with the power of the Congress to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government. That was the only kind of activity described by Woodrow Wilson in *Congressional Government* when he wrote: "The informing function of Congress should be preferred even to its legislative function." *Id.,* at 303. From the earliest times in its history, the Congress has assiduously performed an "informing function" of this nature. See Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv. L. Rev. 153, 168–194.

[34] Compare the treatment of this point in *Barenblatt* v. *United States,* 240 F. 2d 875, 880–881; *Morford* v. *United States,* 176 F. 2d 54, 58; *Eisler* v. *United States,* 170 F. 2d 273, 278–279; *United States* v. *Josephson,* 165 F. 2d 82, 89; and *United States* v. *Kamin,* 136 F. Supp. 791, 800–801.

are endowed with the full power of the Congress to compel testimony. In this case, only two men exercised that authority in demanding information over petitioner's protest.

An essential premise in this situation is that the House or Senate shall have instructed the committee members on what they are to do with the power delegated to them. It is the responsibility of the Congress, in the first instance, to insure that compulsory process is used only in furtherance of a legislative purpose. That requires that the instructions to an investigating committee spell out that group's jurisdiction and purpose with sufficient particularity. Those instructions are embodied in the authorizing resolution. That document is the committee's charter. Broadly drafted and loosely worded, however, such resolutions can leave tremendous latitude to the discretion of the investigators. The more vague the committee's charter is, the greater becomes the possibility that the committee's specific actions are not in conformity with the will of the parent House of Congress.

The authorizing resolution of the Un-American Activities Committee was adopted in 1938 when a select committee, under the chairmanship of Representative Dies, was created.[35] Several years later, the Committee was made a standing organ of the House with the same mandate.[36] It defines the Committee's authority as follows:

> "The Committee on Un-American Activities, as a whole or by subcommittee, is authorized to make from time to time investigations of (1) the extent, character, and objects of un-American propaganda activities in the United States, (2) the diffusion

---

[35] H. Res. 282, 75th Cong., 3d Sess., 83 Cong. Rec. 7568, 7586.

[36] H. Res. 5, 79th Cong., 1st Sess., 91 Cong. Rec. 10, 15.

within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (3) all other questions in relation thereto that would aid Congress in any necessary remedial legislation." [37]

It would be difficult to imagine a less explicit authorizing resolution. Who can define the meaning of "un-American"? What is that single, solitary "principle of the form of government as guaranteed by our Constitution"? [38] There is no need to dwell upon the language, however. At one time, perhaps, the resolution might have been read narrowly to confine the Committee to the subject of propaganda. [39] The events that have transpired in the fifteen years before the interrogation of petitioner make such a construction impossible at this date.

The members of the Committee have clearly demonstrated that they did not feel themselves restricted in any way to propaganda in the narrow sense of the word. [40]

---

[37] H. Res. 5, 83d Cong., 1st Sess., 99 Cong. Rec. 18, 24.

[38] For contrasting views, see *Morford* v. *United States,* 176 F. 2d 54, 57–58, and *Barsky* v. *United States,* 167 F. 2d 241, 247–248.

[39] The language of the resolution was obviously taken from the Dickstein resolution, which established the McCormack Committee in 1934 to study Nazi and other propaganda sent into the United States from foreign countries. H. Res. 198, 73d Cong., 2d Sess., 78 Cong. Rec. 4934, 4949.

[40] In 1947, Judge Charles E. Clark, now Chief Judge of the Court of Appeals for the Second Circuit, wrote about the Committee: "Suffice it to say here that its range of activity has covered all varieties of organizations, including the American Civil Liberties Union, the C. I. O., the National Catholic Welfare Conference, the Farmer-Labor party, the Federal Theatre Project, consumers' organizations, various publications from the magazine 'Time' to the 'Daily Worker,' and varying forms and types of industry, of which the recent

Unquestionably the Committee conceived of its task in the grand view of its name. Un-American activities were its target, no matter how or where manifested. Notwithstanding the broad purview of the Committee's experience, the House of Representatives repeatedly approved its continuation. Five times it extended the life of the special committee.[41] Then it made the group a standing committee of the House.[42] A year later, the Committee's charter was embodied in the Legislative Reorganization Act.[43] On five occasions, at the beginning of sessions of Congress, it has made the authorizing resolution part of the rules of the House.[44] On innumerable occasions, it has passed appropriation bills to allow the Committee to continue its efforts.

Combining the language of the resolution with the construction it has been given, it is evident that the preliminary control of the Committee exercised by the House

---

investigation of the movie industry is fresh in the public mind. While it has avoided specific definition of what it is seeking, it has repeatedly inquired as to membership in the Communist party and in other organizations which it regards as communist controlled or affected." *United States* v. *Josephson*, 165 F. 2d 82, 95 (dissent). See also the dissenting opinion of Judge Henry W. Edgerton, now Chief Judge of the Court of Appeals for the District of Columbia Circuit, in *Barsky* v. *United States*, 83 U. S. App. D. C. 127, at 143, 167 F. 2d 241, at 257.

[41] H. Res. 26, 76th Cong., 1st Sess., 84 Cong. Rec. 1098, 1127–1128; H. Res. 321, 76th Cong., 3d Sess., 86 Cong. Rec. 572, 604–605; H. Res. 90, 77th Cong., 1st Sess., 87 Cong. Rec. 886, 899; H. Res. 420, 77th Cong., 2d Sess., 88 Cong. Rec. 2282, 2297; H. Res. 65, 78th Cong., 1st Sess., 89 Cong. Rec. 795, 809–810.

[42] 91 Cong. Rec. 10, 15.

[43] 60 Stat. 812, 828.

[44] H. Res. 5, 80th Cong., 1st Sess., 93 Cong. Rec. 38; H. Res. 5, 81st Cong., 1st Sess., 95 Cong. Rec. 10; H. Res. 7, 82d Cong., 1st Sess., 97 Cong. Rec. 17, 19; H. Res. 5, 83d Cong., 1st Sess., 99 Cong. Rec. 15; H. Res. 5, 84th Cong., 1st Sess., 101 Cong. Rec. 11.

of Representatives is slight or non-existent. No one could reasonably deduce from the charter the kind of investigation that the Committee was directed to make. As a result, we are asked to engage in a process of retroactive rationalization. Looking backward from the events that transpired, we are asked to uphold the Committee's actions unless it appears that they were clearly not authorized by the charter. As a corollary to this inverse approach, the Government urges that we must view the matter hospitably to the power of the Congress—that if there is any legislative purpose which might have been furthered by the kind of disclosure sought, the witness must be punished for withholding it. No doubt every reasonable indulgence of legality must be accorded to the actions of a coordinate branch of our Government. But such deference cannot yield to an unnecessary and unreasonable dissipation of precious constitutional freedoms.

The Government contends that the public interest at the core of the investigations of the Un-American Activities Committee is the need by the Congress to be informed of efforts to overthrow the Government by force and violence so that adequate legislative safeguards can be erected. From this core, however, the Committee can radiate outward infinitely to any topic thought to be related in some way to armed insurrection. The outer reaches of this domain are known only by the content of "un-American activities." Remoteness of subject can be aggravated by a probe for a depth of detail even farther removed from any basis of legislative action. A third dimension is added when the investigators turn their attention to the past to collect minutiae on remote topics, on the hypothesis that the past may reflect upon the present.

The consequences that flow from this situation are manifold. In the first place, a reviewing court is unable

to make the kind of judgment made by the Court in *United States* v. *Rumely, supra.* The Committee is allowed, in essence, to define its own authority, to choose the direction and focus of its activities. In deciding what to do with the power that has been conferred upon them, members of the Committee may act pursuant to motives that seem to them to be the highest. Their decisions, nevertheless, can lead to ruthless exposure of private lives in order to gather data that is neither desired by the Congress nor useful to it. Yet it is impossible in this circumstance, with constitutional freedoms in jeopardy, to declare that the Committee has ranged beyond the area committed to it by its parent assembly because the boundaries are so nebulous.

More important and more fundamental than that, however, it insulates the House that has authorized the investigation from the witnesses who are subjected to the sanctions of compulsory process. There is a wide gulf between the responsibility for the use of investigative power and the actual exercise of that power. This is an especially vital consideration in assuring respect for constitutional liberties. Protected freedoms should not be placed in danger in the absence of a clear determination by the House or the Senate that a particular inquiry is justified by a specific legislative need.

It is, of course, not the function of this Court to prescribe rigid rules for the Congress to follow in drafting resolutions establishing investigating committees. That is a matter peculiarly within the realm of the legislature, and its decisions will be accepted by the courts up to the point where their own duty to enforce the constitutionally protected rights of individuals is affected. An excessively broad charter, like that of the House Un-American Activities Committee, places the courts in an untenable position if they are to strike a balance between the public need for a particular interrogation and the right of

citizens to carry on their affairs free from unnecessary governmental interference. It is impossible in such a situation to ascertain whether any legislative purpose justifies the disclosures sought and, if so, the importance of that information to the Congress in furtherance of its legislative function. The reason no court can make this critical judgment is that the House of Representatives itself has never made it. Only the legislative assembly initiating an investigation can assay the relative necessity of specific disclosures.

Absence of the qualitative consideration of petitioner's questioning by the House of Representatives aggravates a serious problem, revealed in this case, in the relationship of congressional investigating committees and the witnesses who appear before them. Plainly these committees are restricted to the missions delegated to them, i. e., to acquire certain data to be used by the House or the Senate in coping with a problem that falls within its legislative sphere. No witness can be compelled to make disclosures on matters outside that area. This is a jurisdictional concept of pertinency drawn from the nature of a congressional committee's source of authority. It is not wholly different from nor unrelated to the element of pertinency embodied in the criminal statute under which petitioner was prosecuted. When the definition of jurisdictional pertinency is as uncertain and wavering as in the case of the Un-American Activities Committee, it becomes extremely difficult for the Committee to limit its inquiries to statutory pertinency.

Since World War II, the Congress has practically abandoned its original practice of utilizing the coercive sanction of contempt proceedings at the bar of the House. The sanction there imposed is imprisonment by the House until the recalcitrant witness agrees to testify or disclose the matters sought, provided that the incarceration does

not extend beyond adjournment. The Congress has instead invoked the aid of the federal judicial system in protecting itself against contumacious conduct. It has become customary to refer these matters to the United States Attorneys for prosecution under criminal law.

The appropriate statute is found in 2 U. S. C. § 192. It provides:

"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months." [45]

[45] This statute was passed in 1857 as a direct result of an incident which caused the Congress to feel that it needed more severe sanctions to compel disclosures than were available in the historical procedure of summoning the recalcitrant witness before the bar of either House of Congress and ordering him held in custody until he agreed to testify. Such imprisonment is valid only so long as the House remains in session. See *Anderson* v. *Dunn*, 6 Wheat. 204, 231; Eberling, Congressional Investigations, 180–184.

The immediate cause for adoption of the statute was an accusation by one J. W. Simonton, a newspaperman, that certain unnamed Congressmen were soliciting bribes on a matter pending before the legislature. Simonton was cited before the House of Representatives and refused to divulge the names of those implicated. In the course of that episode, the forerunner of 2 U. S. C. § 192 was passed in order ". . . to inflict a greater punishment than the committee believe the House possesses the power to inflict." Cong. Globe, 34th

In fulfillment of their obligation under this statute, the courts must accord to the defendants every right which is guaranteed to defendants in all other criminal cases. Among these is the right to have available, through a sufficiently precise statute, information revealing the standard of criminality before the commission of the alleged offense.[46] Applied to persons prosecuted under § 192, this raises a special problem in that the statute defines the crime as refusal to answer "any question pertinent to the question under inquiry." Part of the standard of criminality, therefore, is the pertinency of the questions propounded to the witness.[47]

The problem attains proportion when viewed from the standpoint of the witness who appears before a congressional committee. He must decide at the time the questions are propounded whether or not to answer. As the Court said in *Sinclair* v. *United States,* 279 U. S. 263, the witness acts at his peril. He is ". . . bound rightly to construe the statute." *Id.,* at 299. An erroneous determination on his part, even if made in the utmost good faith, does not exculpate him if the court should later rule that the questions were pertinent to the question under inquiry.

It is obvious that a person compelled to make this choice is entitled to have knowledge of the subject to

Cong., 3d Sess. 405. See also *id.,* at 403–413, 426–433, 434–445. Thereafter, having been in custody more than two weeks, Simonton testified to the satisfaction of the committee and was discharged. 3 Hinds' Precedents § 1669.

[46] *United States* v. *Harriss,* 347 U. S. 612; *United States* v. *Cardiff,* 344 U. S. 174; *Winters* v. *New York,* 333 U. S. 507; *Musser* v. *Utah,* 333 U. S. 95; *Lanzetta* v. *New Jersey,* 306 U. S. 451.

[47] *United States* v. *Orman,* 207 F. 2d 148; *Bowers* v. *United States,* 202 F. 2d 447; *United States* v. *Kamin,* 135 F. Supp. 382, 136 F. Supp. 791.

which the interrogation is deemed pertinent. That knowledge must be available with the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense. The "vice of vagueness" [48] must be avoided here as in all other crimes. There are several sources that can outline the "question under inquiry" in such a way that the rules against vagueness are satisfied. The authorizing resolution, the remarks of the chairman or members of the committee, or even the nature of the proceedings themselves, might sometimes make the topic clear. This case demonstrates, however, that these sources often leave the matter in grave doubt.

The first possibility is that the authorizing resolution itself will so clearly declare the "question under inquiry" that a witness can understand the pertinency of questions asked him. The Government does not contend that the authorizing resolution of the Un-American Activities Committee could serve such a purpose. Its confusing breadth is amply illustrated by the innumerable and diverse questions into which the Committee has inquired under this charter since 1938. If the "question under inquiry" were stated with such sweeping and uncertain scope, we doubt that it would withstand an attack on the ground of vagueness.

That issue is not before us, however, in light of the Government's position that the immediate subject under inquiry before the Subcommittee interviewing petitioner was only one aspect of the Committee's authority to investigate un-American activities. Distilling that single topic from the broad field is an extremely difficult task upon the record before us. There was an opening statement by the Committee Chairman at the outset of the

---

[48] *United States* v. *Josephson,* 165 F. 2d 82, 88.

hearing, but this gives us no guidance. In this statement, the Chairman did no more than paraphrase the authorizing resolution and give a very general sketch of the past efforts of the Committee.[49]

---

[49] "The committee will be in order. I should like to make an opening statement regarding our work here in the city of Chicago. The Congress of the United States, realizing that there are individuals and elements in this country whose aim it is to subvert our constitutional form of government, has established the House Committee on Un-American Activities. In establishing this committee, the Congress has directed that we must investigate and hold hearings, either by the full committee or by a subcommittee, to ascertain the extent and success of subversive activities directed against these United States.

"On the basis of these investigations and hearings, the Committee on Un-American Activities reports its findings to the Congress and makes recommendations from these investigations and hearings for new legislation. As a result of this committee's investigations and hearings, the Internal Security Act of 1950 was enacted.

"Over the past fifteen years this committee has been in existence, both as a special and permanent committee, it has made forty-seven recommendations to the Congress to insure proper security against subversion. I am proud to be able to state that of these forty-seven recommendations, all but eight have been acted upon in one way or another. Among these recommendations which the Congress has not acted upon are those which provide that witnesses appearing before congressional committees be granted immunity from prosecution on the information they furnish.

"The committee has also recommended that evidence secured from confidential devices be admissible in cases involving the national security. The executive branch of Government has now also asked the Congress for such legislation. A study is now being made of various bills dealing with this matter.

"The Congress has also referred to the House Committee on Un-American Activities a bill which would amend the National Security Act of 1950. This bill, if enacted into law, would provide that the Subversive Activities Control Board should, after suitable hearings and procedures, be empowered to find if certain labor organizations are in fact Communist-controlled action groups. Following this action, such labor groups would not have available the use of the

No aid is given as to the "question under inquiry" in the action of the full Committee that authorized the creation of the Subcommittee before which petitioner appeared. The Committee adopted a formal resolution giving the Chairman the power to appoint subcommittees ". . . for the purpose of performing any and all acts which the Committee as a whole is authorized to do." [50] In effect, this was a device to enable the investigations to proceed with a quorum of one or two members and

---

National Labor Relations Board as they now have under the provisions of the Labor-Management Relations Act of 1947.

"During the first session of this 83rd Congress, the House Un-American Activities Committee has held hearings in Los Angeles and San Francisco, California; Albany and New York City, New York; Philadelphia, Pennsylvania, and Columbus, Ohio. We are here in Chicago, Illinois, realizing that this is the center of the great midwestern area of the United States.

"It cannot be said that subversive infiltration has had a greater nor a lesser success in infiltrating this important area. The hearings today are the culmination of an investigation that has been conducted by the committee's competent staff and is a part of the committee's intention for holding hearings in various parts of the country.

"The committee has found that by conducting its investigations and holding hearings in various parts of the country, it has been able to secure a fuller and more comprehensive picture of subversive efforts throughout our nation. Every witness who has been subpoenaed to appear before the committee here in Chicago, as in all hearings conducted by this committee, are [sic] known to possess information which will assist the committee in performing its directed function to the Congress of the United States." (R. 43–44; Hearing, supra, note 2, Part 1, at 4165–4166.)

[50] The Committee convened in executive session on January 22, 1953, and adopted the following resolution:

"BE IT RESOLVED, that the Chairman shall have authority from time to time to appoint subcommittees composed of one or more members of the Committee on Un-American Activities for the purpose of performing any and all acts which the Committee as a whole is authorized to do." (R. 91.)

sheds no light on the relevancy of the questions asked of petitioner.[51]

The Government believes that the topic of inquiry before the Subcommittee concerned Communist infiltration in labor. In his introductory remarks, the Chairman made reference to a bill, then pending before the Committee,[52] which would have penalized labor unions controlled or dominated by persons who were, or had been, members of a "Communist-action" organization, as de-

---

[51] The original resolution authorizing subcommittees was amended on March 3, 1954, to require any subcommittee to consist of at least three members, two of whom-could constitute a quorum. (R. 92.)

Petitioner appeared before a subcommittee composed at the outset of four members. After a recess in the course of his testimony, only two committeemen were present. It was during this latter phase of his testimony that petitioner refused to answer the questions involved in this case.

[52] The bill pending at the time of the Chairman's remarks, March 15, 1954, and when petitioner testified a month later was H. R. 7487, 100 Cong. Rec. 763. No action was ever taken on this proposal. Introduced by Representative Velde, it would have withdrawn the rights, privileges and benefits under the National Labor Relations Act of any labor organization which was substantially directed, dominated or controlled by persons who were or ever had been members of a "Communist-action organization," as that phrase is used in the Internal Security Act.

On July 6, 1954, after extensive hearings, the Senate Judiciary Committee reported favorably on S. 3706, a bill drafted by that committee to amend the Internal Security Act. Two days later, Representative Velde introduced H. R. 9838, which was identical to S. 3706. These bills eventually became law. 68 Stat. 775. The Act created the concept of a "Communist infiltrated organization," and part of its provisions declared that a labor union that came within that definition should be barred from the rights, privileges and benefits of the National Labor Relations Act. The same sanctions were applied to a labor group that was a "Communist-action" or "Communist-front organization" under the original Internal Security Act.

fined in the Internal Security Act of 1950. The Subcommittee, it is contended, might have been endeavoring to determine the extent of such a problem.

This view is corroborated somewhat by the witnesses who preceded and followed petitioner before the Subcommittee. Looking at the entire hearings, however, there is strong reason to doubt that the subject revolved about labor matters. The published transcript is entitled: Investigation of Communist Activities in the Chicago Area, and six of the nine witnesses had no connection with labor at all.[53]

The most serious doubts as to the Subcommittee's "question under inquiry," however, stem from the precise questions that petitioner has been charged with refusing to answer. Under the terms of the statute, after all, it is these which must be proved pertinent. Petitioner is charged with refusing to tell the Subcommittee whether or not he knew that certain named persons had been members of the Communist Party in the past. The Subcommittee's counsel read the list from the testimony of a previous witness who had identified them as Communists. Although this former witness was identified with labor, he had not stated that the persons he named were involved in union affairs. Of the thirty names propounded to petitioner, seven were completely unconnected with organized labor. One operated a beauty parlor. Another was a watchmaker. Several were identified as "just citizens" or "only Communists." When

---

[53] The first four witnesses testified principally about the Communist Party activities of an employee of the National Cancer Institute of the United States Public Health Service. A Chicago attorney related to the Subcommittee his experiences with Communist youth organizations during his college days. The sixth witness told of her work as a district organizer for the Communist Party in Montana, Wyoming, Idaho and the Dakotas during the 1930's.

almost a quarter of the persons on the list are not labor people, the inference becomes strong that the subject before the Subcommittee was not defined in terms of Communism in labor.

The final source of evidence as to the "question under inquiry" is the Chairman's response when petitioner objected to the questions on the grounds of lack of pertinency. The Chairman then announced that the Subcommittee was investigating "subversion and subversive propaganda." [54] This is a subject at least as broad and indefinite as the authorizing resolution of the Committee, if not more so.

Having exhausted the several possible indicia of the "question under inquiry," we remain unenlightened as to the subject to which the questions asked petitioner were pertinent. Certainly, if the point is that obscure after trial and appeal, it was not adequately revealed to petitioner when he had to decide at his peril whether or not to answer. Fundamental fairness demands that no witness be compelled to make such a determination with so little guidance. Unless the subject matter has been made to appear with undisputable clarity, it is the duty of the investigative body, upon objection of the witness on grounds of pertinency, to state for the record the subject

---

[54] "This committee is set up by the House of Representatives to investigate subversion and subversive propaganda and to report to the House of Representatives for the purpose of remedial legislation.

"The House of Representatives has by a very clear majority, a very large majority, directed us to engage in that type of work, and so we do, as a committee of the House of Representatives, have the authority, the jurisdiction, to ask you concerning your activities in the Communist Party, concerning your knowledge of any other persons who are members of the Communist Party or who have been members of the Communist Party, and so, Mr. Watkins, you are directed to answer the question propounded to you by counsel." (R. 86; Hearings, *supra*, note 2, Part 3, at 4275–4276.)

under inquiry at that time and the manner in which the propounded questions are pertinent thereto.[55]  To be meaningful, the explanation must describe what the topic under inquiry is and the connective reasoning whereby the precise questions asked relate to it.

The statement of the Committee Chairman in this case, in response to petitioner's protest, was woefully inadequate to convey sufficient information as to the pertinency of the questions to the subject under inquiry.  Petitioner was thus not accorded a fair opportunity to determine whether he was within his rights in refusing to answer, and his conviction is necessarily invalid under the Due Process Clause of the Fifth Amendment.

We are mindful of the complexities of modern government and the ample scope that must be left to the Congress as the sole constitutional depository of legislative power.  Equally mindful are we of the indispensable function, in the exercise of that power, of congressional investigations.  The conclusions we have reached in this case will not prevent the Congress, through its committees, from obtaining any information it needs for the proper fulfillment of its role in our scheme of government. The legislature is free to determine the kinds of data that should be collected.  It is only those investigations that are conducted by use of compulsory process that give rise to a need to protect the rights of individuals against illegal encroachment.  That protection can be readily achieved through procedures which prevent the separation of power from responsibility and which provide the constitutional requisites of fairness for witnesses.  A measure of added care on the part of the House and the Senate in authorizing the use of compulsory process and by their committees in exercising that power would suffice.

---

[55] Cf. *United States* v. *Kamin,* 136 F. Supp. 791, 800.

That is a small price to pay if it serves to uphold the principles of limited, constitutional government without constricting the power of the Congress to inform itself.

The judgment of the Court of Appeals is reversed, and the case is remanded to the District Court with instructions to dismiss the indictment.

*It is so ordered.*

MR. JUSTICE BURTON and MR. JUSTICE WHITTAKER took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, concurring.

I deem it important to state what I understand to be the Court's holding. Agreeing with its holding, I join its opinion.

The power of the Congress to punish for contempt of its authority is, as the Court points out, rooted in history. It has been acknowledged by this Court since 1821. *Anderson* v. *Dunn,* 6 Wheat. 204. Until 1857, Congress was content to punish for contempt through its own process. By the Act of January 24, 1857, 11 Stat. 155, as amended by the Act of January 24, 1862, 12 Stat. 333, Congress provided that, "in addition to the pains and penalties now existing" (referring of course to the power of Congress itself to punish for contempt), "contumacy in a witness called to testify in a matter properly under consideration by either House, and deliberately refusing to answer questions pertinent thereto, shall be a misdemeanor against the United States." *In re Chapman,* 166 U. S. 661, 672. This legislation is now 2 U. S. C. § 192. By thus making the federal judiciary the affirmative agency for enforcing the authority that underlies the congressional power to punish for contempt, Congress necessarily brings into play the specific provisions of the Constitution relating to the prosecution of offenses and those implied restrictions under which courts function.

To turn to the immediate problem before us, the scope of inquiry that a committee is authorized to pursue must be defined with sufficiently unambiguous clarity to safeguard a witness from the hazards of vagueness in the enforcement of the criminal process against which the Due Process Clause protects. The questions must be put with relevance and definiteness sufficient to enable the witness to know whether his refusal to answer may lead to conviction for criminal contempt and to enable both the trial and the appellate courts readily to determine whether the particular circumstances justify a finding of guilt.

While implied authority for the questioning by the Committee, sweeping as was its inquiry, may be squeezed out of the repeated acquiescence by Congress in the Committee's inquiries, the basis for determining petitioner's guilt is not thereby laid. Prosecution for contempt of Congress presupposes an adequate opportunity for the defendant to have awareness of the pertinency of the information that he has denied to Congress. And the basis of such awareness must be contemporaneous with the witness' refusal to answer and not at the trial for it. Accordingly, the actual scope of the inquiry that the Committee was authorized to conduct and the relevance of the questions to that inquiry must be shown to have been luminous at the time when asked and not left, at best, in cloudiness. The circumstances of this case were wanting in these essentials.

MR. JUSTICE CLARK, dissenting.

As I see it the chief fault in the majority opinion is its mischievous curbing of the informing function of the Congress. While I am not versed in its procedures, my experience in the Executive Branch of the Government leads me to believe that the requirements laid down in the opinion for the operation of the committee system of

inquiry are both unnecessary and unworkable. It is my purpose to first discuss this phase of the opinion and then record my views on the merits of Watkins' case.

## I.

It may be that at times the House Committee on Un-American Activities has, as the Court says, "conceived of its task in the grand view of its name." And, perhaps, as the Court indicates, the rules of conduct placed upon the Committee by the House admit of individual abuse and unfairness. But that is none of our affair. So long as the object of a legislative inquiry is legitimate and the questions propounded are pertinent thereto, it is not for the courts to interfere with the committee system of inquiry. To hold otherwise would be an infringement on the power given the Congress to inform itself, and thus a trespass upon the fundamental American principle of separation of powers. The majority has substituted the judiciary as the grand inquisitor and supervisor of congressional investigations. It has never been so.

## II.

Legislative committees to inquire into facts or conditions for assurance of the public welfare or to determine the need for legislative action have grown in importance with the complexity of government. The investigation that gave rise to this prosecution is of the latter type. Since many matters requiring statutory action lie in the domain of the specialist or are unknown without testimony from informed witnesses, the need for information has brought about legislative inquiries that have used the compulsion of the subpoena to lay bare needed facts and a statute, 2 U. S. C. § 192 here involved, to punish recalcitrant witnesses. The propriety of investigations has long been recognized and rarely curbed by the courts, though

constitutional limitations on the investigatory powers are admitted.[1] The use of legislative committees to secure information follows the example of the people from whom our legislative system is derived. The British method has variations from that of the United States but fundamentally serves the same purpose—the enlightenment of Parliament for the better performance of its duties. There are standing committees to carry on the routine work, royal commissions to grapple with important social or economic problems, and special tribunals of inquiry for some alleged offense in government.[2] Our Congress has since its beginning used the committee system to inform itself. It has been estimated that over 600 investigations have been conducted since the First Congress. They are "a necessary and appropriate attribute of the power to legislate . . . ." *McGrain* v. *Daugherty*, 273 U. S. 135, 175 (1927).

The Court indicates that in this case the source of the trouble lies in the "tremendous latitude" given the Un-American Activities Committee in the Legislative Reorganization Act.[3] It finds that the Committee "is

---

[1] *United States* v. *Rumely*, 345 U. S. 41 (1953); *Sinclair* v. *United States*, 279 U. S. 263 (1929); *Reed* v. *County Commissioners*, 277 U. S. 376 (1928); *McGrain* v. *Daugherty*, 273 U. S. 135 (1927); Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv. L. Rev. 153 (1926).

[2] Symposium on Congressional Investigations, 18 U. of Chi. L. Rev. 421, Finer, The British System, 521, 532, 554, 561 (1951).

[3] The Committee originated in 1938 under H. Res. 282, 75th Cong., 3d Sess., 83 Cong. Rec. 7568, and was patterned after a resolution of 1934 authorizing the investigation of Nazi propaganda. H. Res. 198, 73d Cong., 2d Sess., 78 Cong. Rec. 4934. The resolution read much the same as the present authority of the Committee which is quoted below. By a succession of House Resolutions (H. Res. 26, 76th Cong., 1st Sess., 84 Cong. Rec. 1098; H. Res. 321, 76th Cong., 3d Sess., 86 Cong. Rec. 572; H. Res. 90, 77th Cong., 1st Sess., 87 Cong. Rec. 886; H. Res. 420, 77th Cong., 2d Sess., 88 Cong. Rec. 2282; H. Res. 65, 78th Cong., 1st Sess., 89 Cong. Rec. 795) the

allowed, in essence, to define its own authority, [and] to choose the direction and focus of its activities." This, of course, is largely true of all committees within their respective spheres. And, while it is necessary that the "charter," as the opinion calls the enabling resolution, "spell out [its] jurisdiction and purpose," that must necessarily be in more or less general terms. An examination of the enabling resolutions of other committees reveals the extent to which this is true.

Permanent or standing committees of both Houses have been given power in exceedingly broad terms. For example, the Committees on the Armed Services have jurisdiction over "Common defense generally"; [4] the Committees on Interstate and Foreign Commerce have

---

Committee continued in existence until in 1945, by amendment of the House Rules, it was made a standing committee. 91 Cong. Rec. 10, 15. The Legislative Reorganization Act of 1946 retained it as one of the standing committees and provided:

"All proposed legislation, messages, petitions, memorials, and other matters relating to the subjects listed under the standing committees named below shall be referred to such committees, respectively: . . ."

"(q) . . . (2) The Committee on Un-American Activities, as a whole or by subcommittee, is authorized to make from time to time investigations of (i) the extent, character, and objects of un-American propaganda activities in the United States, (ii) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (iii) all other questions in relation thereto that would aid Congress in any necessary remedial legislation." 60 Stat. 823, 828.

The Committee is authorized to sit and act at any time, anywhere in the United States and to require the attendance of witnesses and the production of books and papers. A resolution of the Eighty-third Congress adopted the Rules of the previous Congresses as amended by the Legislative Reorganization Act of 1946. H. Res. 5, 83d Cong., 1st Sess., 99 Cong. Rec. 15, 16, 18, 24.

[4] 60 Stat. 815, 824.

jurisdiction over "Interstate and foreign commerce generally"; [5] and the Committees on Appropriation have jurisdiction over "Appropriation of the revenue for the support of the Government." [6] Perhaps even more important for purposes of comparison are the broad authorizations given to select or special committees established by the Congress from time to time. Such committees have been "authorized and directed" to make full and complete studies "of whether *organized crime* utilizes the facilities of interstate commerce or otherwise operates in interstate commerce"; [7] "of . . . *all lobbying activities* intended to influence, encourage, promote, or retard legislation"; [8] "to determine the extent to which current

[5] 60 Stat. 817, 826.

[6] 60 Stat. 815, 824.

[7] S. Res. 202, 81st Cong., 2d Sess., in pertinent part provides:

"authorized and directed to make a full and complete study and investigation of whether organized crime utilizes the facilities of interstate commerce or otherwise operates in interstate commerce in furtherance of any transactions which are in violation of the law of the United States or of the State in which the transactions occur, and, if so, the manner and extent to which, and the identity of the persons, firms, or corporations by which such utilization is being made, what facilities are being used, and whether or not organized crime utilizes such interstate facilities or otherwise operates in interstate commerce for the development of corrupting influences in violation of law of the United States or of the laws of any State: *Provided, however,* That nothing contained herein shall authorize (1) the recommendation of any change in the laws of the several States relative to gambling, or (2) any possible interference with the rights of the several States to prohibit, legalize, or in any way regulate gambling within their borders."

[8] H. Res. 298, 81st Cong., 1st Sess., in pertinent part provides:

"authorized and directed to conduct a study and investigation of (1) all lobbying activities intended to influence, encourage, promote, or retard legislation; and (2) all activities of agencies of the Federal Government intended to influence, encourage, promote, or retard legislation."

222

literature . . . containing *immoral,* [or] *obscene* . . . matter, or placing *improper* emphasis on crime . . . are being made available to the people of the United States . . ."; [9] and "of the extent to which criminal or other *improper* practices . . . are, or have been, engaged in in *the field of labor-management relations* . . . to the *detriment* of the *interests* of the public . . . ." [10]   (Emphasis added in each example.)   Surely these authorizations permit the committees even more "tremendous latitude" than the "charter" of the Un-American Activities Committee. Yet no one has suggested that the powers granted were too broad.   To restrain and limit the breadth of investigative power of this Committee necessitates the similar handling of all other committees.   The resulting restraint imposed on the committee system appears to cripple the system beyond workability.

The Court finds fault with the use made of compulsory process, power for the use of which is granted the Com-

---

[9] H. Res. 596, 82d Cong., 2d Sess., in pertinent part provides:

"authorized and directed to conduct a full and complete investigation and study (1) to determine the extent to which current literature—books, magazines, and comic books—containing immoral, obscene, or otherwise offense matter, or placing improper emphasis on crime, violence, and corruption, are being made available to the people of the United States through the United States mails and otherwise; and (2) to determine the adequacy of existing law to prevent the publication and distribution of books containing immoral, offensive, and other undesirable matter."

[10] S. Res. 74, 85th Cong., 1st Sess., in pertinent part provides:

"authorized and directed to conduct an investigation and study of the extent to which criminal or other improper practices or activities are, or have been, engaged in in the field of labor-management relations or in groups or organizations of employees or employers to the detriment of the interests of the public, employers or employees, and to determine whether any changes are required in the laws of the United States in order to protect such interests against the occurrence of such practices or activities."

mittee in the Reorganization Act. While the Court finds that the Congress is free "to determine the kinds of data" it wishes its committees to collect, this has led, the Court says, to an encroachment on individual rights through the abuse of process. To my mind this indicates a lack of understanding of the problems facing such committees. I am sure that the committees would welcome voluntary disclosure. It would simplify and relieve their burden considerably if the parties involved in investigations would come forward with a frank willingness to cooperate. But everyday experience shows this just does not happen. One needs only to read the newspapers to know that the Congress could gather little "data" unless its committees had, unfettered, the power of subpoena. In fact, Watkins himself could not be found for appearance at the first hearing and it was only by subpoena that he attended the second. The Court generalizes on this crucial problem saying "added care on the part of the House and the Senate in authorizing the use of compulsory process and by their committees in exercising that power would suffice." It does not say how this "added care" could be applied in practice; however, there are many implications since the opinion warns that "procedures which prevent the separation of power from responsibility" would be necessary along with "constitutional requisites of fairness for witnesses." The "power" and "responsibility" for the investigations are, of course, in the House where the proceeding is initiated. But the investigating job itself can only be done through the use of committees. They must have the "power" to force compliance with their requirements. If the rule requires that this power be retained in the full House then investigations will be so cumbrous that their conduct will be a practical impossibility. As to "fairness for witnesses" there is nothing in the record showing any abuse of Watkins. If anything, the Committee was abused by his recalcitrance.

While ambiguity prevents exactness (and there is "vice in vagueness" the majority reminds), the sweep of the opinion seems to be that "preliminary control" of the Committee must be exercised. The Court says a witness' protected freedoms cannot "be placed in danger in the absence of a clear determination by the House or the Senate that a particular inquiry is justified by a specific legislative need." Frankly I do not see how any such procedure as "preliminary control" can be effected in either House of the Congress. What will be controlled preliminarily? The plans of the investigation, the necessity of calling certain witnesses, the questions to be asked, the details of subpoenas *duces tecum,* etc.? As it is now, Congress is hard pressed to find sufficient time to fully debate and adopt all needed legislation. The Court asserts that "the Congress has practically abandoned its original practice of utilizing the coercive sanction of contempt proceedings at the bar of the House." This was to be expected. It may be that back in the twenties and thirties Congress could spare the time to conduct contempt hearings, but that appears impossible now. The Court places a greater burden in the conduct of contempt cases before the courts than it does before "the bar of the House." It cites with approval cases of contempt tried before a House of the Congress where no more safeguards were present than we find here. In contempt prosecutions before a court, however, the majority places an investigative hearing on a par with a criminal trial, requiring that "knowledge of the subject to which the interrogation is deemed pertinent . . . must be available [to the witness] with the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense." I know of no such claim ever being made before. Such a requirement has never been thought applicable to investigations and is wholly out of place when related to the informing func-

tion of the Congress. See Frankfurter, Hands Off The Investigations, 38 New Republic, May 21, 1924, p. 329, 65 Cong. Rec. 9080–9082. The Congress does not have the facts at the time of the investigation for it is the facts that are being sought. In a criminal trial the investigation has been completed and all of the facts are at hand. The informing function of the Congress is in effect "a study by the government of circumstances which seem to call for study in the public interest." See Black, Inside a Senate Investigation, 172 Harper's Magazine, Feb. 1936, pp. 275, 278. In the conduct of such a proceeding it is impossible to be as explicit and exact as in a criminal prosecution. If the Court is saying that its new rule does not apply to contempt cases tried before the bar of the House affected, it may well lead to trial of all contempt cases before the bar of the whole House in order to avoid the restrictions of the rule. But this will not promote the result desired by the majority. Summary treatment, at best, could be provided before the whole House because of the time factor, and such treatment would necessarily deprive the witness of many of the safeguards in the present procedures. On review here the majority might then find fault with that procedure.

### III.

Coming to the merits of Watkins' case, the Court reverses the judgment because: (1) The subject matter of the inquiry was not "made to appear with undisputable clarity" either through its "charter" or by the Chairman at the time of the hearing and, therefore, Watkins was deprived of a clear understanding of "the manner in which the propounded questions [were] pertinent thereto"; and (2) the present committee system of inquiry of the House, as practiced by the Un-American Activities Committee, does not provide adequate safeguards for the protection

of the constitutional right of free speech. I subscribe to neither conclusion.

Watkins had been an active leader in the labor movement for many years and had been identified by two previous witnesses at the Committee's hearing in Chicago as a member of the Communist Party. There can be no question that he was fully informed of the subject matter of the inquiry. His testimony reveals a complete knowledge and understanding of the hearings at Chicago. There the Chairman had announced that the Committee had been directed "to ascertain the extent and success of subversive activities directed against these United States [and] On the basis of these investigations and hearings . . . [report] its findings to the Congress and [make] recommendations . . . for new legislation." He pointed to the various laws that had been enacted as a result of Committee recommendations. He stated that "The Congress has also referred to the House Committee on Un-American Activities a bill which would amend the National Security Act of 1950" which, if made law, would restrict the availability of the Labor Act to unions not "in fact Communist-controlled action groups." The Chairman went on to say that "It cannot be said that subversive infiltration has had a greater nor a lesser success in infiltrating this important area. The hearings today are the culmination of an investigation . . . . Every witness who has been subpoenaed to appear before the committee here in Chicago . . . [is] known to possess information which will assist the Committee in performing its directed function to the Congress of the United States."

A subpoena had issued for Watkins to appear at the Chicago hearings but he was not served. After Watkins was served the hearing in question was held in Washington, D. C. Reference at this hearing was made to the one conducted in Chicago. Watkins came before the

Committee with a carefully prepared statement. He denied certain testimony of the previous witnesses and declared that he had never been a "card-carrying member" of the Party. He admitted that for the period 1942–1947 he "cooperated with the Communist Party . . . participated in Communist activities . . . made contributions . . . attended caucuses at [his union's] convention at which Communist Party officials were present . . . [and] freely cooperated with the Communist Party . . . ." This indicated that for a five-year period he, a union official, was cooperating closely with the Communist Party even permitting its officials to attend union caucuses. For the last two years of this liaison the Party had publicly thrown off its cloak of a political party. It was a reconstituted, militant group known to be dedicated to the overthrow of our Government by force and violence. In this setting the Committee attempted to have Watkins identify 30 persons, most of whom were connected with labor unions in some way. While one "operated a beauty parlor" and another was "a watchmaker," they may well have been "drops" or other functionaries in the program of cooperation between the union and the Party. It is a *non sequitur* for the Court to say that since "almost a quarter of the persons on the list are not labor people, the inference becomes strong that the subject before the Subcommittee was not defined in terms of Communism in labor." I submit that the opposite is true.

## IV.

I think the Committee here was acting entirely within its scope and that the purpose of its inquiry was set out with "undisputable clarity." In the first place, the authorizing language of the Reorganization Act [11] must be read as a whole, not dissected. It authorized investi-

---

[11] See note 3, *supra*.

gation into subversive activity, its extent, character, objects, and diffusion. While the language might have been more explicit than using such words as "un-American," or phrases like "principle of the form of government," still these are fairly well understood terms. We must construe them to give them meaning if we can. Our cases indicate that rather than finding fault with the use of words or phrases, we are bound to presume that the action of the legislative body in granting authority to the Committee was with a legitimate object "if [the action] is *capable* of being so construed." (Emphasis added.) *People ex rel. McDonald* v. *Keeler,* 99 N. Y. 463, 487, 2 N. E. 615, 627–628 (1885), as quoted and approved in *McGrain* v. *Daugherty, supra,* at 178. Before we can deny the authority "it must be obvious that" the Committee has "exceeded the bounds of legislative power." *Tenney* v. *Brandhove,* 341 U. S. 367, 378 (1951). The fact that the Committee has often been attacked has caused close scrutiny of its acts by the House as a whole and the House has repeatedly given the Committee its approval. "Power" and "responsibility" have not been separated. But the record in this case does not stop here. It shows that at the hearings involving Watkins, the Chairman made statements explaining the functions of the Committee.[12] And, furthermore, Watkins' action at the hear-

---

[12] See *supra,* at p. 226. See also the statement by Congressman Velde, Chairman of the Committee on Un-American Activities, April 29, 1954, at Washington, D. C., where Mr. Velde stated, *inter alia:* "This committee is set up by the House of Representatives to investigate subversion and subversive propaganda and to report to the House of Representatives for the purpose of remedial legislation.

"The House of Representatives has by a very clear majority, a very large majority, directed us to engage in that type of work, and so we do, as a committee of the House of Representatives, have the authority, the jurisdiction, to ask you concerning your activities in the Communist Party, concerning your knowledge of any other persons

ing clearly reveals that he was well acquainted with the purpose of the hearing. It was to investigate Communist infiltration into his union. This certainly falls within the grant of authority from the Reorganization Act and the House has had ample opportunity to limit the investigative scope of the Committee if it feels that the Committee has exceeded its legitimate bounds.

The Court makes much of petitioner's claim of "exposure for exposure's sake" and strikes at the purposes of the Committee through this catch phrase. But we are bound to accept as the purpose of the Committee that stated in the Reorganization Act together with the statements of the Chairman at the hearings involved here. Nothing was said of exposure. The statements of a single Congressman cannot transform the real purpose of the Committee into something not authorized by the parent resolution. See *United States v. Rumely,* 345 U. S. 41 (1953); *Sinclair v. United States,* 279 U. S. 263, 290, 295 (1929). The Court indicates that the questions propounded were asked for exposure's sake and had no pertinency to the inquiry. It appears to me that they were entirely pertinent to the announced purpose of the Committee's inquiry. Undoubtedly Congress has the power to inquire into the subjects of communism and the Communist Party. *American Communications Assn. v. Douds,* 339 U. S. 382 (1950). As a corollary of the congressional power to inquire into such subject matter, the Congress, through its committees, can legitimately seek to identify individual members of the Party. *Barsky v. United States,* 83 U. S. App. D. C. 127, 167 F. 2d 241 (1948), cert. denied, 334 U. S. 843. See also *Lawson v. United States,* 85 U. S. App. D. C. 167, 170–171, 176 F. 2d 49, 52–53

---

who are members of the Communist Party or who have been members of the Communist Party, and so, Mr. Watkins, you are directed to answer the question propounded to you by counsel."

230

(1949), cert. denied, 339 U. S. 934; *United States* v. *Josephson*, 165 F. 2d 82, 90–92 (1947), cert. denied, 333 U. S. 838.

The pertinency of the questions is highlighted by the need for the Congress to know the extent of infiltration of communism in labor unions. This technique of infiltration was that used in bringing the downfall of countries formerly free but now still remaining behind the Iron Curtain. The *Douds* case illustrates that the Party is not an ordinary political party and has not been at least since 1945. Association with its officials is not an ordinary association. Nor does it matter that the questions related to the past. Influences of past associations often linger on as was clearly shown in the instance of the witness Matusow and others. The techniques used in the infiltration which admittedly existed here might well be used again in the future. If the parties about whom Watkins was interrogated were Communists and collaborated with him, as a prior witness indicated, an entirely new area of investigation might have been opened up. Watkins' silence prevented the Committee from learning this information which could have been vital to its future investigation. The Committee was likewise entitled to elicit testimony showing the truth or falsity of the prior testimony of the witnesses who had involved Watkins and the union with collaboration with the Party. If the testimony was untrue a false picture of the relationship between the union and the Party leaders would have resulted. For these reasons there were ample indications of the pertinency of the questions.

## V.

The Court condemns the long-established and long-recognized committee system of inquiry of the House because it raises serious questions concerning the protection it affords to constitutional rights. It concludes that com-

pelling a witness to reveal his "beliefs, expressions or associations" impinges upon First Amendment rights. The system of inquiry, it says, must "insure that the Congress does not unjustifiably encroach upon an individual's right to privacy nor abridge his liberty of speech, press, religion or assembly." In effect the Court honors Watkins' claim of a "right to silence" which brings all inquiries, as we know, to a "dead end." I do not see how any First Amendment rights were endangered here. There is nothing in the First Amendment that provides the guarantees Watkins claims. That Amendment was designed to prevent attempts by law to curtail freedom of speech. *Whitney* v. *California,* 274 U. S. 357, 375 (1927). It forbids Congress from making any law "abridging the freedom of speech, or of the press." It guarantees Watkins' right to join any organization and make any speech that does not have an intent to incite to crime. *Dennis* v. *United States,* 341 U. S. 494 (1951). But Watkins was asked whether he knew named individuals and whether they were Communists. He refused to answer on the ground that his rights were being abridged. What he was actually seeking to do was to protect his former associates, not himself, from embarrassment. He had already admitted his own involvement. He sought to vindicate the rights, if any, of his associates. It is settled that one cannot invoke the constitutional rights of another. *Tileston* v. *Ullman,* 318 U. S. 44, 46 (1943).

As already indicated, even if Watkins' associates were on the stand they could not decline to disclose their Communist connections on First Amendment grounds. While there may be no restraint by the Government of one's beliefs, the right of free belief has never been extended to include the withholding of knowledge of past events or transactions. There is no general privilege of silence. The First Amendment does not make speech or silence permissible to a person in such measure as he

chooses. Watkins has here exercised his own choice as to when he talks, what questions he answers, and when he remains silent. A witness is not given such a choice by the Amendment. Remote and indirect disadvantages such as "public stigma, scorn and obloquy" may be related to the First Amendment, but they are not enough to block investigation. The Congress has recognized this since 1862 when it first adopted the contempt section, R. S. § 103, as amended, 2 U. S. C. § 193, declaring that no witness before a congressional committee may refuse to testify "upon the ground that his testimony to such fact or his production of such paper may tend to disgrace him or otherwise render him infamous." See also *McGrain* v. *Daugherty, supra,* at 179–180; *United States* v. *Josephson,* 165 F. 2d 82, 89 (1947), cert. denied, 333 U. S. 838. See also Report on Congressional Investigations, Assn. of the Bar of the City of New York, 3–4 (1948).

We do not have in this case unauthorized, arbitrary, or unreasonable inquiries and disclosures with respect to a witness' personal and private affairs so ably and properly denounced in the *Sinclair* case, *supra,* at 291–292. This inquiry is far different from the cases relied upon by the Court. There is no analogy to the case of Richard Thompson [13] involving the sermons of clergymen. It is not Floyd's [14] case involving criticism of the royal family. There is no resemblance to John Wilkes' struggle for a seat in Parliament. It is not *Briggs* [15] where the prosecutor sought to develop the national origin of policemen. It is not *Kilbourn* [16] involving a private real estate pool.

---

[13] *Proceedings against Richard Thompson,* 8 How. St. Tr. 2 (1680).

[14] See 1 De Lolme, The Rise and Progress of the English Constitution (1838), at 347–348.

[15] *Briggs* v. *Mackellar,* 2 Abb. Pr. 30, 65 (N. Y. Common Pleas 1855).

[16] *Kilbourn* v. *Thompson,* 103 U. S. 168 (1881).

Nor is it *Quinn*,[17] *Emspak*,[18] or *Bart*,[19] involving the Fifth Amendment.   It is not *Rumely*[20] involving the interpretation of a lobbying statute.   Nor is this "a new kind of congressional inquiry unknown in prior periods of American history . . . [*i. e.*] a broad scale intrusion into the lives and affairs of private citizens."   As I see it only the setting is different.   It involves new faces and new issues brought about by new situations which the Congress feels it is necessary to control in the public interest.   The difficulties of getting information are identical if not greater.   Like authority to that always used by the Congress is employed here and in the same manner so far as congressional procedures are concerned.   We should afford to Congress the presumption that it takes every precaution possible to avoid unnecessary damage to reputations.   Some committees have codes of procedure, and others use the executive hearing technique to this end.   The record in this case shows no conduct on the part of the Un-American Activities Committee that justifies condemnation.   That there may have been such occasions is not for us to consider here.   Nor should we permit its past transgressions, if any, to lead to the rigid restraint of all congressional committees.   To carry on its heavy responsibility the compulsion of truth that does not incriminate is not only necessary to the Congress but is permitted within the limits of the Constitution.

---

[17] *Quinn* v. *United States,* 349 U. S. 155 (1955).
[18] *Emspak* v. *United States,* 349 U. S. 190 (1955).
[19] *Bart* v. *United States,* 349 U. S. 219 (1955).
[20] *United States* v. *Rumely,* 345 U. S. 41 (1953).