(No. 42562.—

JOHN F. CUSACK *et al.,* Appellees, *vs.* MICHAEL J. HOWLETT *et al.,* Appellants.

*Opinion filed Nov. 26, 1969.—Rehearing denied Jan. 28, 1970.*

· WILLIAM D. HUNDLEY, of Washington, D.C., for appellants.

LEONARD RING, of Chicago, for appellees.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

This is a statutory taxpayers' action brought by five attorneys to enjoin the expenditure of public funds by a special committee of the House of Representatives of the General Assembly. The circuit court of Cook County granted leave to file the action. (Ill. Rev. Stat. 1967, ch. 102, par. 14.) Thereafter the parties agreed to stand upon their verified pleadings, and the court entered a decree which enjoined the expenditure of public funds in furtherance of the activities of the committee because the resolution establishing it violated the constitution of Illinois. The defendants, who are the members of the legislative committee, the Auditor of Public Accounts and the State Treasurer, have appealed directly to this court.

The text of the House Resolution which authorized the appointment of the committee is as follows:

"House Resolution No. 249.

"WHEREAS, There have been allegations of judicial impropriety by a member or members of the Illinois Supreme Court; therefore be it

"RESOLVED, By the House of Representatives of the Seventy-sixth General Assembly of the State of Illinois, that a special committee of the House be appointed 4 by the Speaker and 3 by the Minority Leader to investigate these allegations and any other matters relating to judicial impropriety; that the Speaker designate a chairman of the special committee; that the special committee have all the powers of other committees of the House; that the special committee shall close to the public any hearing or meeting upon the vote of any four of its members; that the special committee may hire an attorney for purposes of this investigation; that the expenses of the special committee be paid from the appropriation for the ordinary and incidental expenses of the general staff and operation of the House; and that the special committee report and make its recommendations to the House prior to the first day in the year 1970 that the House is in session."

The fundamental question that the case presents is whether the House Resolution is repugnant to article III of the constitution of Illinois, which provides: "The powers of the government of this state are divided into three distinct departments—the legislative, executive and judicial; and no person, or collection of persons, being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted."

Before we reach that question, however, we are met by the contention of the defendants that this case, in its present posture, does not present a justiciable issue. This contention rests basically upon the fact that the recent decisions of the Supreme Court of the United States that have considered the authority of congressional investigating committees, have involved direct confrontations between the authority of the legislative committee and the constitutional rights of an individual. (See, *e.g.*, *Watkins* v. *United States* (1957), 354 U.S. 178, 1 L. Ed. 2d 1273, 77 S. Ct. 1173.)

From the discussions in those cases, the defendants derive the proposition that a legislative committee must be "permitted to function unchallenged in the Courts * * * until its functioning clashes directly with an individual's Constitutional rights."

This contention overlooks the fact that a distinct difference has long existed between the Federal requirements of justiciability and those applicable in this State. In 1923 the Supreme Court of the United States held in *Massachusetts v. Mellon*, 262 U.S. 447, 67 L. Ed. 1078, 43 S. Ct. 597, that a Federal taxpayer has no right to challenge the validity of legislation by reason of his position as taxpayer. A different rule has long obtained in this State. Since 1917, by statute, a taxpayer has been permitted to challenge the validity of legislative action which involves the expenditure of public funds. (Ill. Rev. Stat. 1967, ch. 102, par. 14.) The very first case decided by this court under the 1917 statute involved a taxpayer's action to enjoin the disbursement of public funds by a joint legislative committee of the House and Senate. The court there said: "As the investigation in question was wholly unwarranted and illegal, appellant, as a tax-payer, has a right to resort to a court of equity to prevent the misapplication of public funds in the payment of the expenses of such an investigation." (*Greenfield* v. *Russel* (1920), 292 Ill. 392, 402.) And even before the 1917 statute established procedural conditions governing a taxpayer's action, such actions had been regularly recognized. (See *Fergus* v. *Russel* (1915), 270 Ill. 304.) The contention that the issue sought to be presented is not ripe for decision is without merit.

The plaintiffs ground their action upon the proposition that the House of Representatives lacks constitutional authority to "investigate judicial improprieties," and in support of that proposition they rely upon several specific provisions of the constitution, in addition to the prohibition of article III against the exercise by one department of govern-

ment of "any power properly belonging to either of the others." The committee, on the other hand, justifies the validity of its authorizing resolution in terms of legislative purposes which, it asserts, will be advanced by the investigation which the resolution authorizes.

Although it is impossible to define with precision the limits of legislative power, the authority of legislative investigating committees to ask questions and compel answers, in order to acquire the information necessary for informed legislative action, was regarded as essential by the British Parliament and has been so regarded from the outset by the Congress of the United States. Nevertheless, the exercise of the power in specific instances has never ceased to give rise to heated legislative debate and to difficult judicial determinations. See Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv. L.R. 152.

Questions as to the authority of the Congress to establish canons of judicial ethics for Federal judges, and to devise a procedure for the determination of judicial misconduct other than the cumbersome process of impeachment, have provided a running debate, sporadically recurrent throughout the generations since the founding of the nation. The story of that debate, implicating as it does the perennial problem of the independence of the judiciary from legislative or executive domination, has recently been recounted. (Kurland, The Constitution and the Tenure of Federal Judges: Some Notes from History, 36 U. of Chgo. L.R. 665.) The ingredients of that continuing debate do not differ basically from the ingredients of the dispute before us. But so far as we have been advised, and so far as we have been able to ascertain, no court has rendered a decision that bears directly on the problem before us.

As pointed out in *Watkins* v. *United States,* 354 U.S. 178, 200-1, 1 L. Ed. 2d 1273, 1291-2, "The theory of a committee inquiry is that the committee members are serv-

ing as the representatives of the parent assembly in collecting information for a legislative purpose. * * * An essential premise in this situation is that the House or Senate shall have instructed the committee members on what they are to do with the power delegated to them. * * * That requires that the instructions to an investigating committee spell out that group's jurisdiction and purpose with sufficient particularity. Those instructions are embodied in the authorizing resolution. That document is the committee's charter."

The committee first contends that its charter of authority, "to investigate any other matters relating to judicial impropriety", is justified by the fact that either house of the General Assembly may, by a two-thirds vote, propose constitutional amendments or submit to the voters the question of calling a constitutional convention. This contention is particularly devoid of plausibility at this moment, for a constitutional convention has been authorized by the General Assembly, approved by the voters and is about to convene. But apart from considerations of the moment, and apart from the fact that the authorizing resolution contains no hint of the purpose now advanced, the suggestion is vulnerable to a more basic objection. If an unstated purpose to explore the desirability of unspecified constitutional changes is a legitimate justification for a legislative investigation, there can be no constitutional limit upon the authority of any investigating committee. For regardless of the limited nature of the authority actually conferred upon such a committee, its power could always be retroactively broadened by the invocation of a purpose to propose constitutional changes. The result would be that so far as investigating committees are concerned, the constitutional doctrine of separation of powers would be eliminated. No authority has been advanced by the committee in support of this position, and we find it unpersuasive.

The same difficulties exist with respect to the committee's

contention that its authority to investigate allegations of judicial impropriety is justified by a reference to the authority of the General Assembly to appropriate for expenses of the judicial system, including the salaries of judges. Again the authorizing resolution is silent as to the purpose now suggested. And again the unexpressed authority sought to be retroactively invoked is so pervasive as to warrant almost any imaginable legislative inquiry.

To sustain the validity of its charter the committee has also invoked the impeachment power of the House of Representatives under section 24 of article IV of the constitution. The continued existence of that power, in view of section 18 of article VI of the constitution, as amended effective January 1, 1964, is sharply disputed by the plaintiffs. Section 18 authorizes the retirement for disability, suspension without pay or removal of any judge by a commission appointed by the Supreme Court. The committee regards this constitutional provision as designed "to cover those twilight situations of judicial incapacity, unfitness or impropriety that could not be reached by impeachment." The plaintiffs contend that the authority to impeach members of the judiciary was eliminated when the constitution of 1870 was adopted, and if that contention is not sustained, they argue alternatively that impeachment was supplanted in 1964 when the present section 18 of the Judicial Article became effective. We need not pursue these contentions, for the committee has conceded, upon oral argument, that the authorizing resolution does not conform to the established pattern of investigating resolutions looking toward impeachment, and that "realistically" impeachment is not a factor in this case.

The real thrust of the committee's argument lies in its assertion of authority to acquire information necessary for informed legislative action in the field of judicial ethics. This contention raises fundamental considerations of public policy, and there is no flavor of retrospective rationalization

about it. As has been indicated, the issues involved are those that have dominated the continuing national debate that Professor Kurland has described.

There is a latent distrust of the ability or willingness of the group of men who at any moment constitute one branch of government so to order the affairs of that branch as to satisfy legitimate public concern. That distrust might be alleviated by placing responsibility for the public and private conduct of judges in the legislative branch of government. But the vulnerability of the judicial branch to legislative encroachment has always been recognized. For example, the constitutional provisions for the removal of judges by legislative address which existed in this State until 1964 all reiterated the substance of the qualification originally contained in section 5 of article IV of the Constitution of 1818: "*Provided, always,* that no member of either house of the general assembly, nor any person connected with a member by consanguinity, or affinity, shall be appointed to fill the vacancy occasioned by such removal." In the course of its history, as will be indicated, the constitution has at one time resolved these competing considerations one way, and at another time, the other way. Our responsibility is to ascertain the choice that is presently expressed in the constitution.

Specifically the committee asserts that it should be presumed that its activities will consist of gathering facts relating to the desirability of legislative action. Amendment of the Governmental Ethics Act (Ill. Rev. Stat. 1967, ch. 127, pars. 601—101 to 607—101) by requiring the public disclosure of compensated nonjudicial activities and by placing limitations on those activities is suggested, as is the enactment of conflict-of-interest statutes.

The Governmental Ethics Act became effective January 1, 1968. It prescribes ethical principles and rules of conduct for legislators and for persons with "legislative interests." It also contains requirements for the disclosure of economic

interests and relationships by legislators, other elected officials, judges, and candidates for those positions. The statute varies considerably with respect to the specificity of identification of economic interests required of legislators as contrasted with other officials. Article VI of the Act establishes a Board of Ethics which is charged with the duty "to recommend legislation relating to legislative ethics and other matters included in this Act." Ill. Rev. Stat. 1967, ch. 127, par. 606—106.

With respect to the judicial department, section 4—301 of the statute requires that written statements of "economic interests and relationships likely to create conflicts of interest" be filed "with the Supreme Court or with such person as is designated by the Supreme Court, at such times, in such detail, and in such manner as the Supreme Court prescribes." (Ill. Rev. Stat. 1967, ch. 127, par. 604—301.) That section also provides that the statements of the judges shall include the information specified in sections 4—202, 4—203 and 4—302 of the Act. Those sections are as follows:

"§ 4—202. A list of economic interests of the person making the disclosure and of members of his immediate family (spouse and minor children living with him), whether in the form of stocks, bonds, realty, equity or creditor interests in proprietorships or partnerships, or otherwise. Exempted from disclosure are:

(a) interests in the form of accounts in banks and savings and loan associations

(b) in the case of equity interests, interests valued at less than $5000 and representing less than 5% of the total equity interests in the entity.

"§ 4—203. A list of every office, directorship and salaried employment of the person making the disclosure and of members of his immediate family (spouse and minor children living with him). However, offices, directorships and salaried employments in political, religious, charitable

and educational entities need not be reported if compensation of less than $1000 per year is being received.

* * *

"§ 4—302. Other economic interests and relationships which could create substantial conflicts of interest, if so determined by the Supreme Court."

On January 26, 1968, shortly after the Governmental Ethics Act became effective, this court entered an order which required all judges and magistrates to file verified statements of economic interests with the Director of the Administrative Office of the Illinois Courts. That order required the specification of the same interests as are described in the Act and provided that the statements would be "preserved, and opened and read only by the members of the Supreme Court or by the Administrative Director under the specific authority of the Supreme Court or when specifically authorized by the Supreme Court for use in proceedings of the Illinois Courts Commission."

The elected members of this court authorized the Administrative Director to make their own statements available to the Special Commission appointed June 17, 1969, to conduct hearings and inquire into the integrity of the judgment of this court in *People* v. *Isaacs*, No. 39797, 37 Ill.2d 205. Those judges also made available to that commission copies of their income tax returns and those of their wives. Except as thus noted, this court has not directed the disclosure of the economic statement of any judge or magistrate.

In this State the doctrine has long prevailed that qualifications for office that are expressed in the constitution may not be supplemented by legislative action. Perhaps the leading decision is *People ex rel. Hoyne* v. *McCormick* (1914), 261 Ill. 413, in which the arguments pro and con were considered at length. The conclusion reached was expressed in these terms: "Where the constitution declares the qualifications for office it is not within the power of the legislature to change or add to them unless the constitution gives that

power. 'It would seem but fair reasoning, upon the plainest principles of interpretation, that when the constitution established certain qualifications as necessary for office it meant to exclude all others as prerequisites. From the very nature of such a provision the affirmance of these qualifications would seem to imply a negative of all others. * * * A power to add new qualifications is certainly equivalent to the power to vary them.' (1 Story on the Constitution, sec. 625.)" 261 Ill. at 420. See also, *People ex rel. Nachman* v. *Carpentier* (1964), 30 Ill.2d 475.

Except for the adoption of the Judicial Article which became effective January 1, 1964, there has been no constitutional change which would alter the legal doctrine that, unless the power is given by the constitution, the General Assembly may not prescribe qualifications for constitutional officers beyond those stated in the constitution itself. Section 30 of article VI of the constitution of 1870 provided: "The general assembly may, for cause entered on the journals, upon due notice and opportunity of defense, remove from office any judge, upon concurrence of three-fourths of all the members elected, of each house." This provision for removal by legislative address necessarily authorized the General Assembly to determine what would constitute cause for the removal of a judge, and thus implied a power in the General Assembly to prescribe standards of judicial conduct.

But this provision was eliminated in the Judicial Article of 1964, and in its place was substituted the present section 18 of article VI which provides: "Notwithstanding the provisions of this Article relating to terms of office, the General Assembly may provide by law for the retirement of judges automatically at a prescribed age; and, subject to rules of procedure to be established by the Supreme Court and after notice and hearing, any judge may be retired for disability or suspended without pay or removed for cause by a commission composed of one judge of the Supreme

244

Court selected by that court, two judges of the Appellate Court selected by that court, and two circuit judges selected by the Supreme Court. Such commission shall be convened by the Chief Justice upon order of the Supreme Court or at the request of the Senate."

The authority to remove judicial officers by legislative address that was formerly given to the legislative department of the government has now been given to the judicial department, and it is the Supreme Court, as the head of that department, which is now authorized to prescribe standards of judicial conduct. The authority of the General Assembly in this area is limited to the fixing of a mandatory retirement age for judges and to the authority granted to the Senate to request that the Courts Commission be convened.

It follows, therefore, that the General Assembly is now without authority to enact standards of judicial ethics and that the provisions of the Governmental Ethics Act, insofar as they relate to judges and magistrates, are without constitutional sanction. Even if we were to presume, therefore, that the authority of the committee to investigate allegations of judicial impropriety might be expanded to include the consideration of amendments to the Governmental Ethics Act or the enactment of a statute relating to conflicts of interest, that authority would still be without constitutional support.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*