*In re* ESTATE OF ZELLA BURGESON (Patrick T. Murphy, Public Guardian of Cook County, Petitioner-Appellant, v. Sheldon Kirshner, Respondent-Appellee).

First District (4th Division)   No. 86—0893

Opinion filed November 5, 1987.

JIGANTI, J., dissenting.

Patrick T. Murphy, *pro se*, and Rebecca S. Kolleng, both of Chicago, for appellant.

Zulkey, Pikarski & Gordon, Chartered, of Chicago (Richard E. Zulkey, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Petitioner, Patrick T. Murphy, the public guardian of Cook County, appeals from an order that denied his petition to vacate portions of two orders entered during probate proceedings in the estate of Zella Burgeson, the deceased. One order approved the final account of the executor, which included the disbursement of attorney fees to respondent, Sheldon Kirshner, the executor's attorney. The other order discharged the special administrator who had been appointed by the court upon Murphy's petition. This order contained a finding that the special administrator had conducted a thorough investigation of the allegations of wrongdoing that Murphy had made against Kirshner, and that he and the court found no impropriety on the part of Kirshner.

Murphy sought to vacate these two orders, entered October 18, 1985, four months after their entry, pursuant to section 2—1401 of the Code of Civil Procedure. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1401.) His section 2—1401 petition was denied on the grounds that he lacked standing and that he failed to exercise due diligence in bringing the petition.

It is apparent from the papers filed in this court that the parties' emotions run high. Murphy has made serious charges of wrongdoing against Kirshner in connection with his handling of the deceased's estate. For his part, Kirshner charges that Murphy is an interloper who has no interest in or standing to object to the orders entered in the estate proceedings, which proceedings have been resolved to the satisfaction of the executor and all of the heirs of the deceased.

We believe that the threshold question is whether Murphy, either as public guardian or an individual, has standing to move to vacate the orders entered in this cause. We hold that he does not.

BACKGROUND

Zella Burgeson, the deceased, was an elderly woman living alone in a condominium in May 1982. The board of managers of the condominium wrote to her brother, John Hounsom, expressing their concern for her welfare and stating that she had become senile.

In January 1983 Burgeson signed a power of attorney granting

Kirshner authority to take care of her needs and pay her expenses, including his own legal fees.

By 1984 Burgeson's neighbors had found that her apartment was dirty, smelled of urine, and was filled with garbage. Kirshner was informed of these facts. In July 1984 police arrested Burgeson's companion, who had been hired by Kirshner, for allegedly attempting to cash a forged check drawn on Burgeson's account. When the police arrived at Burgeson's apartment they found her slumped on a sofa; her feet were swollen. In the bedroom they found pornographic materials and sexual devices, which presumably belonged to the companion. The charges were ultimately dismissed and the companion disappeared, possibly having stolen additional amounts prior to her departure.

After the police discovered Burgeson alone and neglected, Murphy was appointed as Burgeson's temporary guardian. Both he and Kirshner then sought to be named the plenary guardian of Burgeson. In the guardianship proceedings, Kirshner was represented by attorney John Coleman.

Murphy also initiated disciplinary proceedings against Kirshner before the Attorney Registration and Disciplinary Commission (ARDC).

On October 10, 1984, during the pendency of the guardianship proceedings, Burgeson died. Her brother, John Hounsom, who lived in Missouri, was appointed executor of her estate. Hounsom was also beneficiary of 75% of the estate under the will. Kirshner was retained as the executor's attorney.

Murphy was discharged as temporary guardian several days after the opening of the decedent's estate. He soon reentered the picture, however, by filing a petition for the appointment of a special administrator, based upon his belief that Kirshner was contesting routine matters, padding his attorney fees, and otherwise bilking the estate.[1] The court allowed the motion and appointed an independent special administrator, John A. Doyle. The order of appointment provided that his function was "to make a preliminary investigation as to whether there [was] any basis for the Public Guardian's allegations."

A month or two later, the beneficiaries, including the executor, petitioned the court for removal of the special administrator, submitting affidavits demonstrating their support and approval of Kirshner's handling of the estate. The beneficiaries (except for the

---

[1] We note that Kirshner disputed some of the expenses that Murphy incurred as temporary guardian.

executor) were collectively represented by counsel other than Kirshner. Based upon the petition, the special administrator was ordered to refrain from continuing his investigation pending further order of court. At that time he had spent approximately five hours on the investigation. Thereafter, he ceased his activities and ultimately was discharged, upon the closing of the estate and approval of the final account.

In support of the final account, the beneficiaries and the executor filed a second set of affidavits. The executor's affidavit contained invective against Murphy and the police. The other beneficiaries' affidavits contained some hearsay matters. However, all of the affidavits expressed satisfaction with the job that Kirshner had done. The executor expressed his satisfaction with the fees as well, which totalled approximately $60,000 for the combined fees of Kirshner and his attorney, John Coleman.

On April 4, 1985, the court observed that any problems Murphy had with Kirshner could be dealt with before the ARDC and that it would not become involved in a "personality conflict."

The final account was approved, after several continuances, on October 18, 1985. Murphy, not having been given notice, was not present. The final account reflected total receipts in the amount of $189,794.79, total disbursements in the amount of $85,540.68, and a net amount of $104,254.11 available for distribution to the beneficiaries. Kirshner received $25,700 for "services rendered as attorney for representative for the disabled person of Zella Burgeson—litigation"; $10,000 as "attorney fees for representing executor"; and $5,188.80 for "costs and expenses advanced for estate." John Coleman was paid $20,300 for acting as "attorney for John Hounsom, representative for the disabled person's estate of Zella Burgeson—litigation." No itemization was submitted to substantiate these costs and fees.

The final account also reflected a disbursement in the amount of $7,941.31 to "Patrick T. Murphy, as per court order." Murphy received those fees in his official capacity rather than his person capacity, a fact not expressly stated in the order.

By order entered October 18, 1985, the court approved the final account and discharged the executor. The trial court also entered a separate order which discharged the special administrator, finding that his investigation uncovered "no impropriety concerning any charges by any person against SHELDON G. KIRSHNER, JOHN HOUNSOM, Executor, or any other person relative to this estate."

On October 31, 1985, Kirshner submitted the above order to the

ARDC and requested dismissal of Murphy's charges against him.

In January 1986, the ARDC notified Murphy of its decision to dismiss the charges against Kirshner. According to Murphy's affidavit of record, this was the first time he learned of the orders that had been entered on October 18, 1985. He prepared and noticed a motion to vacate those portions of the orders which approved the disbursement of fees and costs to Kirshner and his attorney, and to require them to substantiate those fees and costs. Murphy also sought to amend the order approving final account to reflect that the office of the public guardian rather than Patrick T. Murphy received the fees. Finally, Murphy sought to vacate the finding that the special administrator had conducted a "thorough investigation" and that respondent had committed "no impropriety."

On March 24, 1986, the trial court denied Murphy's request for post-judgment relief. The court questioned whether Murphy had standing to assert a valid defense or claim, noting again that the controversy appeared to be a personal matter between the attorneys. The court further ruled that Murphy had an obligation to monitor the proceedings and did not exercise due diligence in filing his petition.

OPINION

Kirshner contends that the appeal should be dismissed because Murphy lacks standing to seek judicial relief in this matter.

In *Flast v. Cohen* (1968), 392 U.S. 83, 99, 20 L. Ed. 2d 947, 961, 88 S. Ct. 1942, 1952, the court recognized that the gist of the concept of standing is "whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' *Baker v. Carr*, [(1962), 369 U.S. 186, 204, 7 L. Ed. 2d 663, 678, 82 S. Ct. 691, 703]." The "salient aspect of standing is its focus on the *party* seeking an adjudication and not the issue he desires to have adjudicated." (Emphasis added.) (*Murphy v. Collins* (1974), 20 Ill. App. 3d 181, 186, 312 N.E.2d 772, 776.) Hence, the question is whether the party seeking an adjudication is a proper, real party in interest and not whether the claim itself is justiciable.

In *Flast v. Cohen* (1968), 392 U.S. 83, 101-02, 20 L. Ed. 2d 947, 962-63, 88 S. Ct. 1942, 1953, the court noted "[I]n deciding the question of standing, it's not relevant that the substantive issues in the litigation might be nonjusticiable. However, *** it is both appropriate and necessary to look to the substantive issues *** to deter-

mine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." Generally, the injured party has a direct economic stake in the controversy or some other legal right or interest that may be adversely affected unless he or she is allowed to participate in the proceedings. See *American Surety Co. v. Jones* (1943), 384 Ill. 222, 51 N.E.2d 122 ("aggrieved" party is one having right to sue when a legal right is invaded or his pecuniary interest is directly affected by a judgment).

■ In the present case, Murphy's authority to act as public guardian is limited to statutory grant, as found in the provisions of the Probate Act that govern public administrators, guardians, and conservators. (Ill. Rev. Stat. 1985, ch. 110½, par. 13—1 *et seq.*) With certain additions and limitations found in section 13—5 of the Act, public guardians have the same powers and duties as do private guardians for disabled adults. See Ill. Rev. Stat. 1985, ch. 110½, par. 11a—1 *et seq.*

Section 11a—3(b) of the Act sets out the general aim of guardianship, which is to be "utilized only as is necessary to promote the well-being of the disabled person," to protect the person from "neglect, exploitation, or abuse, and to encourage *** self-reliance and independence." Section 11a—18(c) gives the guardian of the estate of the ward authority to appear for and represent the ward in "all legal proceedings," which the Illinois Supreme Court has interpreted to refer to economic matters of the ward's estate, not personal matters such as divorce proceedings. *In re Marriage of Drews* (1986), 115 Ill. 2d 201, 503 N.E.2d 339.

While Burgeson was alive and Murphy was acting as her duly appointed temporary guardian, there is little question but that he had standing to raise the questions that he did regarding Kirshner's handling of Burgeson's property and finances pursuant to the power of attorney. Murphy was contesting Kirshner's petition to be appointed plenary guardian and sought to be named plenary guardian himself.[2] Accordingly, the nexus between his status as her temporary, acting guardian and the claims he sought to have adjudicated was apparent. The question is whether his authority to act on her behalf ended upon her death and the opening of the probate estate.

Section 13—5(h) of the Act provides, in pertinent part: "Upon the death of the ward, the public guardian shall turn over to the

---

[2] We note that a temporary guardian's appointment expires after 60 days or upon the appointment of a regular guardian, whichever is first. Ill. Rev. Stat. 1985, ch. 110½, par. 11a—4.

court-appointed administrator all of the ward's assets and an account of his receipt and administration of the ward's property. A guardian ad litem shall be appointed for an accounting \*\*\*." Section 13—5(i)(1) states: "On petition of any person who appears to have an interest in the estate, the court by temporary order may restrain the public guardian from [acting] \*\*\*." Ill. Rev. Stat. 1985, ch. 110½, pars. 13—5(h), (i)(1).

These provisions strongly suggest that the public guardian's duty to act in his capacity as guardian of his ward is discharged upon her death, following an accounting of her assets and receipts and disbursements that the guardian was responsible for during the guardianship proceedings. His responsibilities, while substantial during the guardianship estate, must logically diminish or cease altogether during the probate proceedings, precisely because there is no further need for the ward to have a guardian. The deceased is represented in the probate proceedings by the court-appointed administrator, or, in this case, executor. Hence, to the extent the guardian takes action beyond submitting his accounts to the administrator or executor of the probate estate, he may be restrained from doing so upon the proper petition of any party with an interest in the estate.

It is undisputed that the heirs of Burgeson's estate petitioned the court to restrain the special administrator from continuing his investigation into Kirshner's activities.[3] Whatever their motivation, which may have been to avoid additional expenses chargeable to the estate, they were entitled to do so. The special administrator, of course, was acting pursuant to and on account of Murphy's petition. Once the heirs and executor demonstrated their satisfaction with Kirshner and petitioned for a restraining order upon the special administrator, however, the public guardian lost whatever basis he had for maintaining an active presence in the probate estate.[4] In a sense, his allegations against Kirshner became moot.

As previously noted, we believe that Murphy's standing or au-

---

[3]Section 13—4 of the Act gives public administrators the same powers and duties of other representatives of the estate until their discharge or until their authority is sooner terminated by order of court.

[4]In fact, we are not fully convinced that he had standing to petition for the appointment of a special administrator in the first place, since he does not claim to be the representative of any of the beneficiaries of the deceased's will and since Burgeson's testamentary intent was for her brother to act as her executor. Nevertheless, we believe that it was within the court's discretion to allow the appointment of the special administrator when it did, since at that time it may not have been clear whether the heirs had been apprised of the alleged wrongdoing of Kirshner.

thority to act in the probate proceedings is necessarily subject to the limitations of the Act itself and whatever reasonable inferences of power flow therefrom. First and foremost, therefore, he was vested with protecting the interests of his ward *when she was alive*. In addition, if his claim in the probate proceedings were based on an economic stake that was frustrated (such as not being paid for his services to Burgeson as her temporary guardian), he would have the necessary interest to fulfill the standing requirement, as a creditor of the probate estate. By extension of this logic, we find reasonable Murphy's request to have the order approving the final account reflect that payments he received were in his official capacity as public guardian, rather than individually.

Beyond that, however, we cannot find the requisite personal stake that Murphy as public guardian has in pursuing an investigation into alleged waste and mismanagement on the part of the executor's attorney, when the executor and all heirs (represented by separate counsel) have made it abundantly clear that they are satisfied with Kirshner and do not wish Murphy to take further action. If they did not object to the substantial fees Kirshner received, we cannot interject this court's opinion as to whether or not the fees were "excessive." Nor could the probate court very well refuse to enter an order that was agreed upon by the real parties in interest—the beneficiaries of the will. They were the only parties whose economic interest was affected by Kirshner's potential wrongdoing.

In *Cotterell v. Coen* (1910), 246 Ill. 410, 92 N.E. 911, the Illinois Supreme Court held that since the guardian of the minor agreed to a settlement of estate matters with the other heirs, the interests of the minor were of no concern to the public administrator and the grant of letters of office to the public administrator should not have been allowed. Although the pending case differs in circumstances, the idea that an agreement or settlement among the heirs concludes a particular issue over the objection of a public administrator or guardian is well taken.

In *Baxley v. Rutland* (M.D. Ala. 1976), 409 F. Supp. 1249, the court was called upon to determine whether the attorney general of Alabama could attack one of the State's statutes in the Federal court on the grounds of unconstitutionality. Noting that the Federal procedural rules require every action to be prosecuted by the real party in interest, the court held that the "subjective opinion of the Attorney General without any other personal stake in the outcome [was] too weak a base to support the concept of standing and the jurisdictional requirement of a case or controversy between parties with adversary

interests." (409 F. Supp. at 1257.) The court also commented that the case was instituted solely upon the authority of the Attorney General and that "[h]is mind alone [was] the directing force." 409 F. Supp. at 1257.

Similarly, in this case the public guardian instituted his section 2—1401 petition under his authority alone, without any personal stake in the outcome. No one else involved in the probate proceedings requested or agreed to his pursuit of Kirshner. Furthermore, he has no basis to assert some type of public interest in the matter, if that is his intention. In *Baxley v. Rutland* (M.D. Ala. 1976), 409 F. Supp. 1249, 1255, the court rejected the Attorney General's contention that his basis for taking judicial action was that he had a responsibility to serve as protector of the general public, especially since he believed that the statute involving a public interest was unconstitutional. Of course, the public guardian is not an Attorney General. Nor is he an ombudsman.

Murphy contends, however, that he has a personal stake in the outcome of the proceedings that he initiated before the ARDC, which were obviated by the order entered in the probate court because the order purported to clear Kirshner of any wrongdoing with respect to the estate. In support of his position, Murphy cites his ethical duty under the Code of Professional Responsibility to report knowledge of any violations of the disciplinary rules. (107 Ill. 2d R. 1—103.) He claims that after he filed a complaint and the ARDC began its investigation, "the Circuit Court of Cook County, through the actions of Judge Henry Budzinski, interfered into the ordinary processes of the ARDC," presumably by entering the aforementioned order.

We reject the notion that the judge, in carrying out his judicial duties and entering orders submitted to him, uncontested, can be accused of "interfering" in the processes of the ARDC, an entirely separate body with a wholly separate function than that of the probate court. Apparently, the judge recognized that Murphy's allegations were more properly brought before the ARDC and so informed him. The fact that the court order was used by Kirshner as a defense to the disciplinary proceedings simply does not confer upon Murphy standing in the probate court to seek vacation of the finding of no wrongdoing.

Murphy discharged his duty under the Code of Professional Responsibility in filing his complaint. It was up to the ARDC to pursue the investigation at that point, not Murphy. Disciplinary proceedings are of course different from private, civil actions in which the plaintiff has the burden of discovery and presenting proofs. Presumably,

Murphy could have testified before the ARDC as to all matters within his knowledge. So, too, could the special administrator, who spent at least five hours on his investigation. Although it is not clear from the record exactly when Murphy filed the disciplinary complaint, we note that the proceedings were initiated approximately concurrently with Murphy's appointment as temporary guardian of Burgeson, which would have been late summer or early fall of 1984. Therefore, the commission had approximately one year to act before the October 18, 1985, order was entered.

Moreover, as we previously noted, in reporting Kirshner to the ARDC, Murphy fulfilled his professional duty as an attorney. What further personal stake he had in the disciplinary proceedings is not specified. He was not in the position of a client who is directly injured by the conduct of his own attorney.

We emphasize that we are not reviewing the substantive allegations of Murphy's petition or expressing an opinion as to their veracity or lack of veracity. Certainly the charges are serious and just as certainly they are unproved allegations. We limit our opinion to the standing issue, which focuses on the party seeking an adjudication, rather than the claim sought to be adjudicated. Therefore, we find that Patrick T. Murphy, as public guardian, lacks the necessary concrete stake in the orders entered October 18, 1985, to maintain his section 2—1401 petition for the relief requested, with the limited exception of the clarification that he received fees for his services on behalf of his office. We further find that his institution of the disciplinary proceedings does not confer upon him standing in the probate court to contest the order that found no wrongdoing on Kirshner's part.

Because of our holding, we need not consider the issue concerning his diligence in bringing the section 2—1401 petition. For the foregoing reasons, we affirm the probate court's denial of the petition and remand the cause for the limited purpose of allowing amendment of the October 18, 1985, order to reflect that Murphy received fees in his official capacity rather than personally.

Affirmed.

JOHNSON, J., concurs.

JUSTICE JIGANTI, dissenting:

During the last undignified days in the life of Zella Burgeson, the public guardian, Patrick T. Murphy, was appointed as her temporary

guardian. Shortly thereafter she died and a probate estate was opened. The probate estate was subsequently closed without, however, any notice to the public guardian, who had requested notice. When the public guardian learned that the estate had been closed, he filed a petition pursuant to section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1401) to vacate the order closing the estate. In the petition, Murphy alleged that certain orders had been obtained by a fraud on the court. That petition was denied on the grounds that Murphy had no standing in the probate estate since he represented Zella Burgeson in the guardian's estate and further that his petition was untimely.

Section 2—408(a) of the Code of Civil Procedure governs intervention as of right. (Ill. Rev. Stat. 1985, ch. 110, par. 2—408(a).) That section is to be liberally construed. (*Standard Bank & Trust Co. v. Village of Oak Lawn* (1978), 61 Ill. App. 3d 174, 177, 377 N.E.2d 1152.) Section 2—408(a) provides in part:

> "Upon timely application anyone shall be permitted as of right to intervene in an action: *** (2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or judgment in the action." (Ill. Rev. Stat. 1985, ch. 110, par. 2—408.)

I believe that Murphy is entitled to intervene because he has an interest, the representation by the executor was inadequate, and Murphy is bound by the final order closing the estate.

A guardianship is designed to protect a disabled person from "neglect, exploitation, or abuse." (Ill. Rev. Stat. 1985, ch. 110½, par. 11a—3(b).) It is the duty of the guardian to "appear for and represent the ward in all legal proceedings." (Ill. Rev. Stat. 1985, ch. 110½, par. 11a—18(c).) While Murphy's interest was in the guardian's estate, the guardian's estate became a part of the decedent's estate when Zella Burgeson died. The bills for the guardian's estate, including the fee for the guardian himself, were paid through the decedent's estate. In order to understand Murphy's interest in protecting the guardian's estate, it is necessary to expand upon the facts.

On January 17, 1983, Sheldon Kirshner, an attorney, had Zella Burgeson, a widow nearly 90 years of age, sign a very broad power of attorney. He notarized her signature. Seven months prior to the date on which Kirshner obtained the power of attorney, the condominium association for the building where Zella Burgeson lived wrote a letter to her brother, John Hounsom, who resided in Missouri. In that letter dated May 31, 1982, the president of the board of man-

agers of the association said that Hounsom should be informed that there had been increasing problems with Zella Burgeson that were potentially serious. The letter stated that in the opinion of the board of directors, Zella Burgeson had become very senile, so much so that if her neighbors did not shop for her and look after her, she could not survive. Specific examples were given. She continually burned her food and neighbors had to come in when they smelled the smoke. She would leave food unused to the extent that it rotted or spoiled. She constantly asked people what day it was and what month it was. The letter expressed concern that Zella Burgeson was vulnerable to being defrauded of money and goods, and concluded by suggesting that if the family was unable to take care of the matter, the association would turn to the public guardian.

Two years after that first letter and 18 months after Kirshner had obtained the power of attorney, the association again wrote a letter, but this time to Kirshner. The letter, dated June 11, 1984, was accompanied by a statement disclosing that one of the unit owners had witnessed Zella Burgeson nude in the lobby of the building, where she had apparently just urinated on the carpeting. The apartment, as described by the neighbor, was shocking in that it was littered with dirty dishes and overflowing garbage on all of the floors and rooms, a urine-saturated sheet was lying in the middle of the living-room floor, and the walk-in closet in the bedroom was piled with at least 4½ feet of clothing and bed linens.

Previously, Kirshner had hired a companion for Zella Burgeson, Janet Collins, who took approximately $4,000 from Burgeson's accounts without authorization. According to Murphy, criminal proceedings against Janet Collins were dismissed at the insistence of Kirshner. In 1983 and 1984, pursuant to the power of attorney, Kirshner paid himself approximately $11,000 in legal fees.

On August 23, 1984, Patrick Murphy, the public guardian, was appointed temporary guardian of the person and estate of Zella Burgeson. He was specifically empowered to investigate and determine the extent of her assets and to take legal action to protect them. Zella Burgeson died seven weeks later on October 10, 1984, at the age of 90. On February 5, 1985, four days after having received a telephone call from a beneficiary concerning a $20,000 bill from Kirshner's attorney, John Coleman, the public guardian requested the circuit court, which was probating the estate of Zella Burgeson, to appoint a special administrator to look into the circumstances under which the attorneys for the estate of Zella Burgeson were acting and how much they were charging. On February 13, 1985, the court ap-

pointed John A. Doyle as special administrator to determine whether there was any basis for allegations of the public guardian and to report back to the court.

The executor of the estate, John Hounsom, who was the brother of Zella Burgeson and the beneficiary of 75% of her estate, requested that the special administrator be dismissed. In his request, he stated that his sister had been in excellent health and that he was satisfied with Kirshner. Preprinted affidavits which contained blank spaces filled by the affiants were also submitted by the other beneficiaries. They recited that Kirshner was "doing a splendid job." On March 8, 1985, the circuit court ordered the special administrator "not to act until further order of court." The special administrator had devoted only several hours to the investigation prior to the suspension of his activities.

Subsequently, a second set of affidavits was submitted in support of the final account. Hounsom again expressed his satisfaction with Kirshner's services and fees. He stated further that he believed that Zella Burgeson still would be alive if Patrick Murphy had not interfered with the family. He characterized Murphy as being deranged, a fiend, and a madman. He admitted that his 90-year-old sister was slowing up but maintained that she was not senile and that she saw to her own needs. Hounsom suggested that the story about the conditions at Zella Burgeson's home was a lie designed by the police to cover the fact that they had made an illegal entry. The form affidavits of the other beneficiaries expressed satisfaction with the services and fees of Kirshner and Coleman. The affidavits recited that Kirshner did not commit any improprieties. All of the beneficiaries' affidavits were replete with hearsay, including references to possible poisoning of Zella Burgeson. Some of the affiants added handwritten disclaimers to their affidavits stating that their affidavits were premised upon hearsay. Murphy filed a complaint with the Attorney Registration and Disciplinary Commission.

The circuit court relied upon the affidavits in approving the final account and closing the estate on October 18, 1985, without notice to Murphy. Kirshner previously had informed the trial court on September 23, 1985, that notice to Murphy was not necessary, even though Murphy had specifically requested notice on April 10, 1985. The final account reflected total receipts in the amount of $189,794.79, total disbursements in the amount of $85,540.68, and a net amount of $104,254.11 available for distribution to the beneficiaries. The disbursements included nearly $60,000 in attorney fees and costs for Kirshner and Coleman.

Also on October 18, 1985, the court entered another order which discharged the special administrator. That order recites, inaccurately, that the special administrator had "conducted a thorough investigation" and had "found no impropriety" on the part of Kirshner, Hounsom or any other person. The record discloses that there was no full investigation and no such finding by the special administrator, whose investigation was suspended by court order on March 8, 1985, after only several hours' worth of work. Kirshner then presented the inaccurate order to the Attorney Registration and Disciplinary Commission. Murphy alleges that based upon that order the ARDC terminated its investigation.

Under the circumstances of this case, Murphy had the requisite interest for intervention. His interest was as guardian of the person and estate of the incompetent. As such, he was responsible for protecting her from neglect, exploitation, and abuse (Ill. Rev. Stat. 1985, ch. 110½, par. 11a—3(b)) and for representing her in all legal proceedings (Ill. Rev. Stat. 1985, ch. 110½, par. 11a—18(c)). Furthermore, the public guardian was specifically enjoined to investigate and determine the extent of her assets and to take legal action to protect them. He uncovered enough evidence disclosing that Zella Burgeson's assets needed to be protected. Kirshner had procured the power of attorney without any witnesses from a woman whose neighbors seven months earlier had characterized as very senile and vulnerable to fraud. Kirshner then paid himself $11,000 in fees while Zella Burgeson was still living, and he and Coleman then collected sizeable additional fees after she died. Clearly, Zella Burgeson's interests were not adequately protected because no one except the public guardian questioned these large fees. Although the majority opinion emphasizes that Hounsom and the other beneficiaries were satisfied with Kirshner, their satisfaction is belied by the hearsay-laden, preprinted form affidavits submitted by Kirshner on their behalf. This fiduciary duty to protect Zella Burgeson's assets from dissipation continued following her death, because the guardian's estate and the decedent's estate were inextricably intertwined. Murphy's bills and other bills incurred in the guardian's estate were paid through the decedent's estate. Kirshner received substantial fees in both estates, and he allegedly bilked both estates.

Murphy also satisfies the other requirements of the intervention statute. His interest was not adequately protected by the executor because no one questioned the fees charged by Kirshner and Coleman either before or after Zella Burgeson's death. Murphy, of course, is bound by the judgment, which effectively disposed of the matters

that he uncovered and forecloses him from taking any further action. Murphy's request for the appointment of a special administrator was timely because it was made only four days after his office had received a telephone call concerning Coleman's $20,000 bill. Murphy's failure to file a formal petition to intervene pursuant to section 2—408(e) (Ill. Rev. Stat. 1985, ch. 110, par. 2—408(e)) was harmless given his prior participation on the guardian's estate, the intertwining of the guardian's estate and the decedent's estate, and the detailed written motion requesting the appointment of a special administrator.

In addition to satisfying the requirements for intervention, Murphy demonstrated due diligence in filing the section 2—1401 petition. On September 23, 1985, Kirshner informed the court that Murphy did not need to be notified of the final account, even though Murphy previously had specifically requested such notice. It was undisputed that Murphy was not given notice of the October 18, 1985, hearing date for the final account. Murphy received notice of the closing of the estate in January of 1986 when the Attorney Registration and Disciplinary Commission informed him that the proceedings against Kirshner were being dismissed and in February filed his section 2—1401 petition to vacate the October 18, 1985, orders.

In denying Murphy's section 2—1401 petition, the circuit court emphasized that it had no choice other than to do what it did since the executor and the other legatees were all satisfied. However, the duty of the court was to the estate to protect the wishes of the decedent; the duty of the court was not to the executor or the other legatees. See *In re Estates of Rice* (1979), 77 Ill. App. 3d 641, 649, 396 N.E.2d 298; *In re Estate of Morgan* (1980), 82 Ill. 2d 26, 411 N.E.2d 213.

Finally, the circuit court observed that it did not know whether Murphy had a valid claim or defense. The case should be remanded for consideration of this substantive aspect of Murphy's section 2—1401 petition.