(No. 66223.—

*In re* ESTATE OF BURGESON (Estate of Zella Burgeson, by Patrick Murphy, Public Guardian, Appellant, v. Sheldon Kirshner, Appellee).

*Opinion filed December 15, 1988.*

478

Patrick T. Murphy and Rebecca S. Kolleng, of Chicago, for appellant.

Richard E. Zulkey, of Zulkey, Pikarski & Gordon, Chtd., and Thomas E. Kluczynski, both of Chicago, and William P. Hapaniewski, of Merrillville, Indiana, for appellee John Hounsom.

Robert A. Carrane, of Carrane, Zwirn, Newman & Freifeld, of Chicago, for appellee beneficiaries.

William T. Regas, of Park Ridge, for appellee Sheldon Kirshner.

JUSTICE RYAN delivered the opinion of the court:

Patrick T. Murphy, the public guardian for Cook County, filed a petition to vacate portions of two orders entered during probate proceedings in the estate of Zella Burgeson. One such order approved the final account of the executor, including the disbursement of fees to respondent, Sheldon Kirshner, the executor's attorney. The

other order discharged a special administrator who had been appointed by the court upon Murphy's petition. This order contained a finding that the special administrator had conducted a thorough investigation of allegations of wrongdoing that Murphy had made against Kirshner, and that he had found no impropriety on Kirshner's part.

These orders were entered on October 18, 1985. Approximately four months later, Murphy, who had not received notice of the entry of the orders, sought to have them vacated pursuant to section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1401). The circuit court denied the petition on the grounds that Murphy lacked standing and that he failed to exercise due diligence in bringing the petition. The appellate court, with one justice dissenting, affirmed that decision based on the standing issue. (163 Ill. App. 3d 233.) We granted Murphy's petition for leave to appeal (107 Ill. 2d R. 315).

Zella Burgeson, the deceased, was an elderly woman who lived alone in a Chicago condominium. In May 1982, other residents of her building wrote to John Hounsom, Burgeson's brother and later executor of her estate, expressing their concern for her welfare. They informed him that Burgeson was growing senile, and was burning food on the stove, leaving the gas ignited and forgetting about it, misplacing her bills and generally becoming unable to take care of her own affairs. The neighbors expressed concern that Burgeson could be taken advantage of by "some unscrupulous person." John Hounsom resided, and still resides, in Missouri.

Hounsom apparently contacted Sheldon Kirshner, an attorney who had done some legal work for Burgeson in the past. Six months after the letter from Burgeson's neighbors, Kirshner had her sign a broad power of attorney, giving Kirshner the power to provide for Burgeson's

medical needs, arrange for housekeeping services, pay all her expenses and pay his own fees, all without supervision. Kirshner signed as a witness to the document and notarized it himself.

By 1984 the neighbors were again expressing concern, this time via letters to Kirshner. He had purportedly hired a "companion" for Burgeson, who was to perform housekeeping and other duties. Despite that fact, the neighbors informed Kirshner that Burgeson was wandering in the lobby naked, had urinated in the lobby and that the odors emanating from her apartment were overwhelming. Neighbors who assisted Burgeson back to her apartment discovered that it was in a "shocking" state of disarray—the sink, counter and tables were littered with dirty dishes, garbage containers overflowed, the bathtub was filled with standing dirty water and the toilet had not been cleaned in some time. The letters also pointed out that the other building residents had been complaining to Kirshner without success for several months.

In July 1984, the police arrested Burgeson's companion, who had been hired by Kirshner, for attempting to cash an allegedly forged Burgeson check at a Jewel food store. Kirshner later requested that charges be dropped against the companion, who promptly disappeared and has not been heard from since. Over a two-month period prior to her arrest and disappearance, the companion allegedly took approximately $4,000 from Burgeson's accounts by cashing various checks. The record does not indicate that Kirshner took any steps to recover any of that money or property.

One of the officers who arrested the companion then went to Burgeson's home. She testified that the place was filthy, and that pornographic literature and sexual devices—presumably belonging to the companion—were found in the bedroom. Burgeson herself was found half-sitting, half-lying on a sofa. She was unkempt and dirty,

and her feet were swollen to the point where she could barely walk.

After Burgeson was discovered in this state of neglect, Murphy was appointed as her temporary guardian. Both he and Kirshner then sought to be named plenary guardian. In the guardianship proceedings, Kirshner was represented by attorney John Coleman. Murphy also initiated disciplinary proceedings against Kirshner before the Attorney Registration and Disciplinary Commission (ARDC).

On October 10, 1984, during the pendency of the guardianship proceedings, Burgeson died. John Hounsom, her brother, was appointed executor of her estate. Hounsom was also beneficiary of 75% of the estate under the will. Hounsom retained Kirshner as his attorney for the probate proceedings.

Murphy was discharged as temporary guardian after the opening of the decedent's estate. However, shortly thereafter he filed a petition for the appointment of a special administrator, alleging that Kirshner had taken advantage of Burgeson while she was alive, had charged excessive fees for his services, and had otherwise bilked both Burgeson and her estate. The court allowed the motion and appointed John A. Doyle as independent special administrator. The order of appointment provided that Doyle was "to make a preliminary investigation as to whether there [was] any basis for the Public Guardian's allegations."

Less than a month later, the executor and other beneficiaries petitioned the court for removal of the special administrator. They submitted affidavits in support of the petition which were essentially identical and of a fill-in-the-blanks nature. Some of the affidavits were from minor beneficiaries, but the record does not establish that the minors were represented by a guardian *ad litem* at this or any other stage of the proceedings. The beneficiaries, except for Hounsom, were represented by counsel other than Kirshner.

Based upon this petition, the court ordered the special administrator to refrain from continuing his investigation until further order of the court. At that time, he had spent approximately five hours in the investigation, which consisted mainly of reviewing documents and conferring with the attorneys. It appears that the special administrator never made contact with any of the beneficiaries.

Subsequently, Kirshner petitioned the court to close the estate and approve the final account. In support, the beneficiaries filed another set of affidavits. The executor's affidavit contained invective and outlandish allegations against Murphy and the police. The other beneficiaries' affidavits contained numerous claims based upon hearsay. However, all of the affidavits expressed satisfaction with Kirshner, and a desire to see the estate closed. The executor expressed his satisfaction with the legal fees as well. The estate's assets came to approximately $190,000. To that point, legal fees for Kirshner and Coleman came to roughly $60,000, about $46,000 of which Burgeson incurred prior to her death. The office of the public guardian had also filed a claim against the estate for fees and reimbursement of guardianship expenses. The claim was paid almost one year after it was filed, just prior to the executor's submission of his final account.

The probate court approved the final account and closed the estate on October 18, 1984. Murphy received no notice of the final account, even though he had requested it, because Kirshner told the court that Murphy need not be given notice. Murphy first learned that the estate was closed approximately three months later, when the ARDC informed him that his complaint against Kirshner had been dismissed. Apparently, Kirshner had used the orders approving the final account and discharging the special administrator to bolster his case

against Murphy's complaint with the ARDC. Upon receiving this information from the ARDC, Murphy filed a section 2—1401 (Ill. Rev. Stat. 1985, ch. 110, par 2—1401) motion to reopen the estate. The trial court denied this motion.

In affirming the trial court's denial of Murphy's section 2—1401 motion, the appellate court held that Murphy had no standing to bring this motion because his interest as Burgeson's guardian terminated upon her death. By interpreting various statutory provisions governing the duties of the public guardian (Ill. Rev. Stat. 1987, ch. 110½, pars. 11a—1 *et seq.*, 13—1 *et seq.*), the court reasoned that the public guardian's responsibilities towards his ward must "diminish or cease altogether during the [decedent's estate] probate proceedings." (163 Ill. App. 3d at 239.) The appellate court further held that the public guardian's only interest in the decedent's estate was that of a creditor, to ensure that fees and expenses incurred during Burgeson's lifetime were paid. Because Murphy did not represent anyone else with an economic interest in the estate, his interest terminated upon payment of the office of the public guardian's claim. The estate paid the claim prior to Murphy's section 2—1401 motion, and thus Murphy lacked standing.

We affirm the appellate court and also hold that Murphy had no standing to bring his section 2—1401 motion. Nevertheless, we find the alleged activities of Kirshner in this case sufficiently serious to warrant further investigation by the ARDC. Accordingly, we find it necessary to present some concluding remarks following our analysis of the standing issue.

Initially, we note that while the Federal courts are courts of limited jurisdiction (J. Nowak, R. Rotunda & J. Young, Handbook on Constitutional Law 24 (1978)), in Illinois, our State Constitution grants the circuit courts "original jurisdiction of all justiciable matters" (Ill.

Const. 1970, art. VI, §9). The 1970 Constitution, like its predecessor, the 1870 Constitution, does not define "justiciable matters." Instead, the courts are left to define this term on a case-by-case basis. (Ill. Ann. Stat., 1970 Const., art. VI, §9, Constitutional Commentary, at 473 (Smith-Hurd 1971).) Standing, as a component of justiciability, must likewise be judicially defined. Therefore, while we are guided in our analysis of standing by decisions of the United States Supreme Court, we recognize that distinct differences exist between standing in Federal court and in Illinois courts (*Cusak v. Howlett* (1969), 44 Ill. 2d 233), and that our analysis may rest upon separate and distinct State constitutional grounds. See *Michigan v. Long* (1983), 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469.

The United States Supreme Court itself has recognized that standing is an "amorphous concept" (*Flast v. Cohen* (1968), 392 U.S. 83, 99, 20 L. Ed. 2d 947, 961, 88 S. Ct. 1942, 1952), and that "[g]eneralizations about standing to sue are largely worthless as such" (*Association of Data Processing Service Organizations, Inc. v. Camp* (1970), 397 U.S. 150, 151, 25 L. Ed. 2d 184, 187, 90 S. Ct. 827, 829). Nevertheless, the Supreme Court has promulgated several tests or analytical tools to aid in determining whether a party has standing. One test is the "nexus" test, utilized by the Court in *Flast v. Cohen* (1968), 392 U.S. 83, 20 L. Ed. 2d 947, 88 S. Ct. 1942, and relied upon by the appellate court in the case before us now. In *Flast*, the Court looked to see "whether there [was] a logical nexus between the status asserted and the claim sought to be adjudicated." (392 U.S. at 102, 20 L. Ed. 2d at 963, 88 S. Ct. at 1953.) This nexus is necessary, the Court stated, to ensure that a litigant has the necessary stake in the outcome of the case to satisfy the requirements of article III of the United States Constitution. Although the Court developed the

nexus test in the area of taxpayer standing, it has since been expanded into other areas. See, *e.g.*, *Linda R.S. v. Richard D.* (1973), 410 U.S. 614, 35 L. Ed. 2d 536, 93 S. Ct. 1146.

In Illinois, while seeking guidance from Federal cases such as *Flast*, we have defined standing under our State Constitution as the requirement of "some injury in fact to a legally recognized interest." (*Glazewski v. Coronet Insurance Co.* (1985), 108 Ill. 2d 243, 254, citing *Lunch v. Devine* (1977), 45 Ill. App. 3d 743, 747-48.) This definition serves as a starting point for our analysis in the case before us. It requires us to examine the statutory duties of the public guardian, and to explore the facts to determine the interest the public guardian has in this case.

We begin by noting that the public guardian has all the powers and duties of any other guardian appointed under the Probate Act of 1975. (Ill. Rev. Stat. 1987, ch. 110½, par. 13—5.) A guardian of the person has a duty to make necessary provisions for his ward's "support, care, comfort, health, education, and maintenance, and such professional services as are appropriate." (Ill. Rev. Stat. 1987, ch. 110½, par. 11a—17(a).) A guardian of a disabled person's estate has a duty to care for, manage and invest the ward's estate (Ill. Rev. Stat. 1987, ch. 110½, par. 11a—18(a)), and to "represent the ward in all legal proceedings" (Ill. Rev. Stat. 1987, ch. 110½, par. 11a—18(c)). In addition, the public guardian has certain additional duties and powers, among them to account for and turn over all the ward's assets to a court-appointed administrator upon the ward's death. (Ill. Rev. Stat. 1987, ch. 110½, par. 13—5(h).) The public guardian takes an oath that he will faithfully discharge the duties of his office (Ill. Rev. Stat. 1987, ch. 110½, par. 13—2); all fees that the public guardian collects are paid into the trea-

sury of the county employing him (Ill. Rev. Stat. 1987, ch. 110½, par. 13—3.1).

In Cook County, the public guardian is also required to be a licensed attorney. (Ill. Rev. Stat. 1987, ch. 110½, par. 13—1.1.) As such, the Cook County public guardian is bound to follow the Code of Professional Responsibility (107 Ill. 2d R. 1—101 *et seq.*). Rule 1—103 of the Code states that "[a] lawyer possessing unprivileged knowledge of a violation of Rule 1—102(a)(3) or (4) [rules which prohibit a lawyer from engaging in illegal conduct involving moral turpitude or conduct involving dishonesty, fraud, deceit, or misrepresentation] *shall* report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation." (Emphasis added.) (107 Ill. 2d R. 1—103.) Rule 1—103 was promulgated under Canon 1 of the Code, which states, "A lawyer should assist in maintaining the integrity and competence of the legal profession." 107 Ill. 2d Canon 1.

It is clear from the statutes and rules cited above that Murphy, in his capacity as temporary guardian, had a "legally recognizable interest" sufficient to achieve standing in any controversy during Burgeson's lifetime and until his discharge as guardian. Furthermore, while we agree with the appellate court that Murphy's duties as Burgeson's guardian terminated upon her death (163 Ill. App. 3d at 239), Murphy continued to have an economic interest in the estate during the pendency of the probate proceedings, because the office of the public guardian was an unpaid creditor of the probate estate under section 18—10 of the Probate Act (Ill. Rev. Stat. 1987, ch. 110½, par. 18—10). The depletion of the decedent's estate through misuse of funds could have affected the economic interest of the office of the public guardian.

Once the office of the public guardian received its fees per the final account in the decedent's estate, Mur-

phy no longer had a "legally recognizable interest" in the probate proceeding, with one exception. As noted by the appellate court, Murphy may have the final account corrected to reflect that his office and not himself individually received fees from Burgeson's estate. Because the executor and all the beneficiaries apparently agreed upon the figures reflected in the final account, the probate court was correct in closing the estate. Murphy filed his section 2—1401 motion after he was discharged as guardian, after his office was paid, and after the estate was closed. Consequently, we hold that Murphy lacked standing to bring this motion and the trial court was correct in denying it. Accordingly, we need not consider the issue of Murphy's diligence in filing his motion.

We are concerned, however, that the denial of this motion, coupled with the dismissal of Murphy's complaint against Kirshner with the ARDC, leaves some serious allegations unanswered. Questions regarding large attorney fees, funds allegedly stolen by Burgeson's companion, Janet Collins, and the proper representation of minors' interests remain unanswered. Attorneys licensed to practice in this State are "officer[s] of this court and [are] licensed by this court to exercise the privilege of practicing law." (*In re Zisook* (1981), 88 Ill. 2d 321, 331.) This court has a duty to protect the public from an attorney's improper practices. (*In re Fisher* (1958), 15 Ill. 2d 139, 154.) We feel that a thorough investigation must be conducted to determine if these allegations against Kirshner and his colleague are true. It would be appropriate for the ARDC to look into these matters to see if any disciplinary action or possible restitution to the beneficiaries of the Burgeson estate might be warranted.

The decision of the appellate court, denying Patrick Murphy's section 2—1401 motion, is affirmed.

*Affirmed.*